ALEXANDER J. CASSATT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CLEMENT A. GRISCOM, 3RD, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

T. ELLWOOD WEBSTER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CHARLES WATSON, 3RD, AND POLLY FAY WATSON, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GERARD H. COSTER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 102619, 102620, 102621, 103694, 104256.    Promulgated July 28, 1942.

*Frederick E. S. Morrison, Esq.,* and *Calvin H. Rankin, Esq.,* for the petitioners.

*Eugene G. Smith, Esq.,* for the respondent.

406

OPINION.

ARUNDELL: Petitioners argue that the total cost of canceling the leases was not deductible in the year of cancellation but should be spread over the 72½-month period during which the Pierce contract was effective. Similar treatment is also urged for the unamortized cost of certain improvements placed upon the relinquished leaseholds by petitioners. Respondent has treated the entire cost of terminating the leases as an expense deductible in 1935 and has accorded a similar treatment to the unamortized cost of the improvements.

This action appears correct. It has long been a rule that the consideration paid for the termination or cancellation of a lease by the lessee is deductible in full by him as an ordinary and necessary expense for the year in which the expense is paid or incurred. Sec. 23 (a), Revenue Act of 1934; *Denholm & McKay Co.*, 2 B. T. A. 444; *Goerke Co.*, 7 B. T. A. 860; cf. *Frank & Seder Co.* v. *Commissioner*, 44 Fed. (2d) 147. With the relinquishment of the leaseholds a loss had been sustained of the unamortized cost of the improvements and, as the statute is specific that losses must be taken in the year sustained, it follows that the proper period to reflect this deduction was the year 1935.

Petitioners contend that if the firm must deduct in the year 1935 the entire cost of terminating the leases, as we have just held, then gain occasioned by the execution of the Pierce contract was also accruable as income in that year. They argue that any other treatment would distort their income, since the termination of the leases and the execution of the contract were both parts of an integral scheme which culminated in the complete liquidation of the firm. They reason that under the Pierce contract the firm received property worth $500,000 in exchange for the transfer of its customers' accounts to Pierce, and that such exchange was one upon which gain was recognized under section 112 (a) of the Revenue Act of 1934. Petitioners maintain that the firm's basis for the contract was cost and that cost in this case was the fair market value of the contract at the time of execution, or $500,000.

Petitioners' argument concerning respondent's inclusion in the firm's gross income for 1936 of the $78,706.93 paid to the firm by Pierce is necessarily premised upon their claim that the firm realized gain upon execution of the Pierce contract in 1935. They assert that the firm should be allowed to amortize the amount of its basis (which they claim to be $500,000) over the period of the contract, or that the payments received by the firm from Pierce should be excluded

from gross income as a return of capital which does not equal the firm's basis for the contract. It should be mentioned at this point that petitioners did not return this alleged profit in their tax returns for the year 1935.

We are of the opinion that petitioners must fail because the premise upon which they have based their claim is false. Petitioners have not shown that the firm realized gain upon execution of the contract. All that the firm received upon execution of the contract was the promise of Pierce to make certain payments in the future, conditioned upon certain contingencies. The firm gave nothing in exchange for Pierce's promise other than its promises to urge its former clients to transfer their accounts to Pierce and to agree to remain a member of the various exchanges and the promises of its partners to refrain from entering the brokerage business using the name of Cassatt. We disregarded the three month-to-month leases which may have passed to Pierce, as they apparently had only a nominal value. We do not understand that an exchange of promises to perform acts in the future is an exchange of property giving rise to gain or loss. The firm's accounts were not property which could be transferred at will.

Furthermore, even if the firm might be said to have transferred "property" in the nature of good will, we think that the transaction was not a closed one upon which gain might be realized. The contract was of a speculative nature and the promises by either side were not of the sort which can be said to have a fair market value. As the Circuit Court of Appeals for the Second Circuit has said concerning a promise to do something in the future, "it is absurd to speak of a promise to pay a sum in the future as having a 'market value,' fair or unfair. Such rights are sold, if at all, only by seeking out a purchaser and higgling with him on the basis of the particular transaction. Even if we could treat the case as an exchange of property, the profit would be realized only when the promise was performed." *Bedell* v. *Commissioner*, 30 Fed. (2d) 622, 624. The receipt of a percentage of the commissions depended upon the customers' accounts being transferred to Pierce, the acceptance of those accounts by Pierce, the customers continuing to transact business with Pierce after transfer of the accounts, the firm's refraining from re-entering the brokerage business, and Pierce's continuance in the brokerage business. With the obligations conditional and indefinite to the extent here present it is our opinion that the firm's rights under the Pierce contract had no fair market value.

No testimony as such was offered on the question of the value of the Pierce contract. The parties stipulated, however, that certain individuals, if called to the stand, would have testified that the contract had a market value of approximately half a million dollars

to the firm. We can not accept this stipulation as establishing that such a conditional, indefinite, and contingent obligation had a fair market value. The actual recovery under the contract was $275,-424.66, a sum very much less than the claimed fair market value. Nor does the fact that a bank might have lent funds on the security of the contract necessarily mean any more than that because of the contract the firm was a good moral risk to repay the moneys loaned. The contract with the bankers made the general partners of the Cassatt Co. liable for the repayment of the $160,000 loan.

The considerations already discussed also prevent the accrual of the sums the firm hoped to realize under the Pierce contract, as there is lacking the definiteness of liability to pay upon which the application of the accrual system of accounting is based. As stated in *John Graf Co.*, 39 B. T. A. 379, 384,

* * * The underlying thought is that pecuniary obligations payable to the taxpayer are considered discharged when incurred, *United States* v. *American Can Co.*, 280 U. S. 412. These must be unconditional obligations, *Lucas* v. *North Texas Lumber Co.*, 281 U. S. 11; and they must be definitely payable, *American National Co.* v. *United States*, 274 U. S. 99. * * *

The complete lack of definiteness in Pierce's obligations would require the treatment laid down by the Supreme Court in *Burnet* v. *Logan*, 283 U. S. 404, in which it was held that income was not realized at the time the transaction was entered into, but after the recovery of the taxpayer's basis, the profit, if any, being taxable when and as received. This holding has been followed consistently by the courts and the Board. *Edwards Drilling Co.*, 35 B. T. A. 341; aff'd., 95 Fed. (2d) 719; *Willis R. Dearing*, 36 B. T. A. 843; aff'd., 102 Fed. (2d) 91. The case of *Robert J. Boudreau*, 45 B. T. A. 390, certainly may not be taken as an authority contrary to *Burnet* v. *Logan*, *supra*, and must rest on its own particular facts. It follows that the amount which the firm received in the taxable year under the Pierce contract must be accounted for as of that time and, as there is no cost basis shown, the total receipts must be included in the firm's gross income.

For the several reasons set forth above we are of the opinion the respondent should be sustained on this point.

We are not unmindful of the fact that some hardship arises from petitioners' inability to offset the cost of canceling the leaseholds against the income received under the Pierce contract. But to use this circumstance as a ground for announcing as a legal proposition that income is presently realized upon the entering into of a contract, of the nature here involved would be indeed unfortunate. In this very case, if petitioners' theory were adopted they would have been required to pay a tax based on the firm's receipt of $500,000 gain, whereas the firm finally received only $275,424.66. Our fiscal system

is geared upon a yearly basis and at times hardships arise by reason thereof. Nevertheless, what we are .dealing with is a law which has for its purpose the raising of revenue to run the Government and set ·periods are necessary for the fixing of each taxpayer's obligations.

Reviewed by the Board.

*Decisions will be entered under Rule 50.*

---

BLACK, concurring: I concur in the result reached, but I do not agree with that part of the majority opinion which holds that the case of *Robert J. Boudreau*, 45 B. T. A. 390, is distinguishable on its facts.

I dissented in the *Boudreau* case. The essence of my dissent was that contracts which provide for future payments contingent upon indeterminable events which may never occur should not be treated as income when entered into, even though they do have a definite ascertainable fair market value. I am still of the same opinion as expressed in that dissent and, therefore, concur in the result reached by the majority opinion herein.

---

LEECH, dissenting: The majority opinion concedes that the result it reaches is a "hardship." I agree. But the deficiency here, substantial as it is, involves only one year. This same "hardship" will necessarily follow the petitioners through the remaining five years of the Pierce contract. I think such a result is wholly unjustified.

Undoubtedly the majority is correct in requiring the firm to deduct as a business expense, in the year of payment, the consideration it paid for canceling the leases. But, in my judgment, the income arising from the sale of its customers' accounts in that same year should be similarly treated and so included in income. Any other treatment would greatly distort income.

The firm and its predecessors had been engaged extensively in the stock brokerage business for many years in Philadelphia and New York. In January 1935 its capital had become impaired. While yet solvent the firm decided to liquidate. Among its assets the firm possessed good will in the form of customers' accounts—the result of its "many years" in business. In order to meet its liquidating liabilities, particularly the consideration required to release the firm from its long term leases, it transferred its good will, evidenced by its customers' accounts, to Pierce in exchange for the Pierce contract. This transfer included an option on several leaseholds of the firm.

I think that the firm's good will, in the form of its customers' accounts, was property, that the Pierce contract had a fair market

value of $480,000 when so received, and that the transaction was therefore taxable. Revenue Act of 1934, secs. 111 (b) and 112 (a). Under sections 113 (a) and 114 (a), the basis of the Pierce contract for the computation of gain or loss on its disposition and exhaustion was its "cost" to the firm. *Holmby Corporation*, 28 B. T. A. 1092; affd., 83 Fed. (2d) 528; *Ambassador Petroleum Co.*, 28 B. T. A. 868; reversed on another point, 81 Fed. (2d) 474; *Countway* v. *Commissioner*, 127 Fed. (2d) 69, reversing 44 B. T. A. 921. That "cost" is the fair market value of the accounts exchanged for the contract—$480,000. The Pierce contract was used in its business by the firm throughout the six-year life of the contract. Upon those two premises, in my judgment, the firm is entitled to amortize that "cost" over the life of the contract, and so to the deduction in the taxable year of one-sixth of that basis, or $80,000. *Edward G. Swartz, Inc.*, 25 B. T. A. 1065; *Perine Machinery Co.*, 22 B. T. A. 450.

The majority opinion disallows any such deduction, on the ground that no taxable exchange occurred in 1935. This conclusion is based upon two premises: (1) No property was transferred by the firm to Pierce, nor was its good will in the form of its customers' accounts conveyed to Pierce, but, instead, Pierce merely employed certain members of the firm for six years to render services in acquiring new accounts for Pierce, and (2) the 1935 transaction was not then closed, since the Pierce contract had no fair market value when received by the firm. Although the majority opinion states that the proceeding was submitted on a stipulation of facts, it includes a "findings of fact", referred to as "Only those facts necessary for disposition of the issue before us * * *", upon which its two premises are supported. I think those "findings of fact" omit some of the stipulated facts upon which the first premise must be decided, and practically all of the facts and evidence upon which the second must be based.

The first of these positions is not taken directly even by the respondent. Obviously, though probably of little value, the leasehold options transferred were property. That the firm possessed valuable property in the form of good will, evidenced by its 9,513 customers' accounts, is hardly open to doubt. See *Houston Natural Gas Corporation* v. *Commissioner*, 90 Fed. (2d) 814; *Perkins Bros.* v. *Commissioner*, 78 Fed. (2d) 152, and cases therein cited. By the present contract the firm agreed to convey this good will—in the form of its customers' accounts—to Pierce. It is stipulated that under the contract the firm agreed to "transfer to E. A. Pierce & Co. (hereinafter called Pierce) all accounts of its customers, in consideration of * * *" Pierce's promise to pay therefor. Pierce thereupon occupied at least part of the brokerage office space theretofore oc-

cupied by the firm. Whatever may be said about the theoretical impossibility of the firm transferring its customers' accounts, certainly it could and did convey its good will to Pierce. The only tangible evidence of that good will was the firm's customers' accounts. The stark fact is that 95 percent of those accounts not only were transferred to Pierce, but remained there throughout the life of the contract. The future payments to be made under that contract were in no sense compensation for future services. They were payable not for any effort or services to Pierce by the members of the firm, but for the business Pierce secured by the transfer. The death of every member of the firm, at least after the identification of the "Cassatt accounts", would not have affected the obligation of Pierce under the contract so long as the firm retained the seat on the New York Stock Exchange to comply with the rules of that body. Under the contract these payments were to be made for the firm's good will, measured by the actual value of that good will to Pierce.

The second premise of the majority, which is the only point seriously argued by the respondent, is that the transaction in January 1935 was not closed and therefore taxable, since the Pierce contract had no fair market value when then received by the firm.

It reaches this conclusion despite the following facts and evidence, all of which and more will be found in the stipulation.

At the time of the sale and transfer of its good will in the form of customers' accounts to Pierce, the firm was a going solvent brokerage business with a history covering many years. It then had 9,513 customers. In the year just closed the firm had realized gross commissions of $439,248.04 from these accounts and, for each of the preceding six years, an average of $843,021.93. Such a sale of the accounts of an established brokerage business was not an unusual thing.

The opinion of E. A. Pierce, senior partner in Pierce, is that the Pierce contract had a fair market value to the firm on the critical date of not less than $500,000. He had been in the stock exchange business for 40 years and, during that period, his firm had made many similar acquisitions of the accounts of brokerage houses. From that experience he expected, on the date of the contract, that at least 90 percent of the business of the firm would be retained by Pierce, that the annual average stock exchange business in general would be at least as good in the following six years as it had been in the preceding six years, that he knew the average gross income received by the firm from its stock exchange business for each of the four preceding years had been $575,000, and that as a consequence he then anticipated that over the ensuing six years the gross commissions to be received by Pierce from the firm customers' accounts would amount to not less than $3,000,000, of which, under the contract, $750,000 would have

been payable to the firm. The opinion of Robert K. Cassatt, who had been the senior partner in the firm until his resignation therefrom in February 1935 in connection with the liquidation, is that it had a similar value. He was thoroughly familiar with and in charge of the business of the firm. He also believed on the critical date that the stock exchange business would be as good during the following six years as it had been during the preceding four years and that the income of the firm from the Pierce contract would be no less than $10,000 per month, or an aggregate of $720,000.

Then there is the compelling uncontradicted categorical testimony of the presidents of two Philadelphia banks that those banks, *in fact*, each loaned the firm $80,000 on the *sole security* of the Pierce contract. The president of one of the banks who negotiated this loan fixed such fair market value at $480,000. He was familiar with the gross commissions of the firm from its stock exchange business during the four years preceding the execution of the Pierce contract. He corroborated both Pierce and Cassatt as to the stock exchange business to be expected by Pierce during the contract period and the income to the firm therefrom under the contract. The opinion of this banker is substantially corroborated by that of the president of the bank which joined in the loan.

Admittedly, only $275,424.66, as the majority points out, was received by the firm from the Pierce contract. But that certainly does not contradict the existence in January 1935 of any fair market value for the contract. Nor does it discredit or affect the weight to be given the opinions of the witnesses or the loans on the security of that contract. Emphatically is this so when it is noted from the stipulation that the volume of the stock transactions on the New York Stock Exchange, which had already decreased from 1,124,800,410 shares in 1929 to 323,845,634 in 1934, continued that decline to 207,599,749 shares in 1940. Obviously that unparalleled drying up of the stock brokerage business following 1935 could scarcely have been reasonably foreseen at the inception of the contract. See *Hickok Oil Corporation* v. *Commissioner*, 120 Fed. (2d) 133.

This evidence of the existence of a fair market value for the Pierce contract when it was received by the petitioners stands uncontradicted. Respondent offered no testimony. It is true, as the majority opinion states, that "no testimony as such was offered on the question of value of the Pierce contract", but the opinions of Pierce, Cassatt, and the bankers, together with their supporting reasons and the fact that the two Philadelphia banks loaned $160,000 on the sole security of that contract, appear in the stipulation. They were so included without limitation or objection and were therefore accepted by the Board and the respondent as admissible testimony of the existence of fair market value of the Pierce contract at the critical date. On brief, respondent

makes this comment: "The Board is not bound as a matter of law to adopt as a determination of value the opinions of these persons, notwithstanding there is no conflicting testimony of other witnesses."

The majority casts aside all this evidence upon its conclusion that *Burnet* v. *Logan*, 283 U. S. 404, concludes the petitioners on this point. However, its discussion basing that conclusion is supported upon a nonexistent premise. It is stated that the accrual by the firm in 1935 of the amounts it *"hoped to receive under the Pierce contract"* was not warranted, since in that year there was no liability upon Pierce to pay any amount, and such liability would not arise until a future year, based upon conditions and happenings of that future year. Unquestioned authority is then cited to support that rule. The fact is that petitioners are not asking for the accrual in 1935 by the firm of the amounts it *hoped to receive* in the future. They seek no accrual. They want only to include in the firm income of 1935 the fair market value of an asset *received in that year* in an exchange.

Moreover, quite recently the Board adopted a new construction of the holding in the *Logan* case. In *Robert J. Boudreau*, 45 B.T.A. 390 (on appeal, C.C.A., 5th Cir.), the Board held that the Supreme Court in the *Logan* case did not mean to say that a promise to pay $450,000 solely out of one-twelfth of the oil produced from an oil lease had no fair market value *per se*. It was held that the existence of such value was always a question of fact. Thus, despite the fugitive nature and the uncertain commercial existence of oil underground, the Board, in the *Boudreau* case, sustained the determination of the respondent that such promised oil payment had a fair market value of $188,470.26 when the contract to pay was made and taxed the petitioners upon the receipt of their respective interests in that amount. The Board made that finding in the face of testimony contradicting the existence of any fair market value. Here there is none.

Petitioners rely most strongly on the *Boudreau* case. The respondent however does not attempt to distinguish it. Neither does the prevailing opinion. I do not think it can be effectively distinguished. As the majority opinion states, of course, *Burnet* v. *Logan, supra*, is still the law. But so is *Robert J. Boudreau, supra*, which merely construes *Burnet* v. *Logan*.

The majority fears the "hardship" to other taxpayers which will follow the precedent of a decision for the taxpayers here. But, though wrongly in my judgment, the precedent has been established in the *Boudreau* case. The majority does not propose to overrule it. The taxpayers there were subjected to the consequent "hardship." By the application of the same rule, I think, the taxpayers here should be relieved from six years of "hardship."

Tyson agrees with this dissent.