*Decision will be entered under Rule 50.*

CAPITOL INDEMNITY INSURANCE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 50803. Filed October 28, 1955.

*Byron Emswiller, Esq.*, for the petitioner.
*John L. Carey, Esq.*, for the respondent.

---

[4] See 1955 P-H vol. 2, par. 17,636.

RAUM, *Judge:* Respondent has determined a deficiency in the income tax of petitioner for the calendar year 1949 in the amount of $5,104.24. A number of issues have been conceded, and the sole question left for our determination is whether a payment of $5,966.26 made by the petitioner in 1949 is deductible as an ordinary and necessary business expense, pursuant to section 23 (a) of the Internal Revenue Code of 1939.

All of the facts have been stipulated, and the stipulation filed by the parties is incorporated herein by this reference.

Petitioner, an Indiana corporation, was organized on November 17, 1939. Its corporation income tax returns for the calendar years 1945 to 1949, inclusive, were filed on the accrual basis with the collector of internal revenue for the district of Indiana at Indianapolis, Indiana.

Petitioner is a general insurance underwriter and is also engaged in allied investment activity. Its name, which at the time of its incorporation was Commercial Indemnity Insurance Co., was changed in 1943 to that which it now bears.

Petitioner's original authorized capital consisted of 20,000 shares of common stock with a par value of $10 per share. In order to acquire a certificate from the State Insurance Department to transact business it was required, pursuant to the laws of the State of Indiana, to have a capital investment of at least $200,000. This amount was eventually acquired by the issuance of shares of stock of a total par value of $100,000, for which, however, $200,000 was actually paid. Of this sum $100,000 represented par value of stock purchased and the other $100,000 a contribution to capital surplus. The stock so issued was denominated "Founder's Stock."

When petitioner was first organized, its promoter, Arthur Wyatt, formulated a plan whereby he also promoted an underwriting company under the name Commercial Underwriters, Inc. (hereinafter called Underwriters). All purchasers of stock of Underwriters held stock in petitioner as well.

On January 2, 1940, petitioner and Wyatt executed a contract (hereinafter called the agency agreement) whereby Wyatt became the sole general agent for petitioner in the State of Indiana for a period of 10 years. Wyatt assigned the agency agreement to Underwriters. Under the agency agreement the agent was to receive 10 per cent of gross premiums, less cancellations, received by petitioner on all Indiana business, and 5 per cent of gross premiums, less cancellations, received by petitioner on all business done outside of Indiana through agents appointed by the sole general agent.

Thereafter, for the claimed purpose of attracting purchasers for the "Founder's Stock" in petitioner Underwriters entered into a stock

participating agreement with each purchaser (hereinafter called the participating agreements) whereby it agreed to repay to such purchaser the full amount paid for the stock, as follows:

Underwriters agreed to set aside from all compensation received from petitioner an amount equal to 2 per cent of petitioner's earned premium income originating in Indiana and 1 per cent of such income of petitioner on business written outside of Indiana upon which compensation was payable to Underwriters. The fund so created was payable in a specified manner, semi-annually pro rata to the holders of the Founder's Stock, until the total issued price thereof should be paid.

On February 15, 1941, the authorized capital stock of petitioner was increased to 50,000 shares of common stock with par value of $10 per share. A further amendment was made on July 29, 1941, whereby the authorized capital stock was changed to consist of 500,000 shares with a par value of $1 per share. The consideration for these shares was stated as being $2 per share, of which $1 was attributed to par value and $1 to surplus. Those shares of stock with a par value of $10 per share already outstanding were exchanged for the new shares.

Underwriters proved unable to produce sufficient business, and negotiations looking to the termination and cancellation of the agency agreement were undertaken by petitioner and Underwriters together with the Insurance Department of the State of Indiana and the Indiana Securities Commission. On April 19, 1943, petitioner and Underwriters entered into an agreement whereby the agency agreement was canceled, and the liability of Underwriters pursuant to the participating agreements was assumed by petitioner.

In its income tax returns for its taxable years 1946 to 1949, inclusive, petitioner claimed the following amounts as deductions on account of payments made as a result of the assumption by it of the participating agreements:

| Year | Amount |
| --- | --- |
| 1946 | $9,972.50 |
| 1947 | 10,393.72 |
| 1948 | 8,788.36 |
| 1949 | 5,966.26 |

The above years prior to 1949 are before the Court only for the purpose of determining the amount, if any, of the net operating loss carryover to which petitioner is entitled for 1949. Deductibility of the payments by petitioner in those years is governed by the same principles applicable to the issue of deductibility of such payments in 1949, and will not be separately discussed.

In his statutory notice of deficiency for the taxable year 1949 respondent has disallowed any deduction on account of the above payment of $5,966.26, on the ground that such payment was not an ordi-

nary and necessary business expense within the meaning of section 23 (a) (1) of the Internal Revenue Code of 1939.

A taxpayer bears the burden of showing clear statutory provision for any deduction claimed. Cf. *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435, 440; *A. Giurlani & Bro.* v. *Commissioner*, 119 F. 2d 852 (C. A. 9); *City Ice Delivery Co.* v. *United States*, 176 F. 2d 347 (C. A. 4). There is no duty on the part of the Commissioner correctly to characterize the transaction or expenditure in question and his failure to do so does not relieve the taxpayer of its burden. Cf. *Alexander Sprunt & Son, Inc.* v. *Commissioner*, 64 F. 2d 424 (C. A. 4). The fact that a given expenditure may have been incurred pursuant to a contractual or other binding obligation does not of itself suffice to make such expense deductible under section 23 (a). *Atlantic Monthly Co.*, 5 T. C. 1025; *Eskimo Pie Corporation*, 4 T. C. 669, affirmed per curiam 153 F. 2d 301 (C. A. 3). See *Interstate Transit Lines* v. *Commissioner*, 319 U. S. 590, where the Supreme Court said at page 594:

It is no answer to this defect of proof that petitioner was obligated by contract to assume Stages' deficit. The mere fact that the expense was incurred under contractual obligation does not of course make it the equivalent of a rightful deduction under Section 23 (a). That subsection limits permitted deductions to those paid or incurred "in carrying on any trade or business." The origin and nature, and not the legal form, of the expense sought to be deducted, determines the applicability of the words of Section 23 (a). * * *

Whether a particular expenditure constitutes an "ordinary and necessary" business expense is generally a question to be resolved in the light of circumstances surrounding the particular taxpayer and the particular expenditure. Cf. *Commissioner* v. *Heininger*, 320 U. S. 467, 473. In the instant proceeding a corporation made payments to its stockholders in proportion to the stock held. Such payments are at least, prima facie, dividends to the extent of available earnings and profits, and thereafter a distribution of capital. No part thereof would normally constitute a deductible business expense.

Here, in addition, the payments by petitioner were made to its stockholders only in their capacities as such stockholders. There is in the case at bar no claim, unlike the argument often advanced in other cases, sometimes with and sometimes without success, that payments to stockholders were in respect of services rendered or some other indebtedness purportedly owed to the shareholders, and only coincidentally to them as the holders of shares of stock of the payor. Cf. *R. E. Nelson*, 19 T. C. 575; *William D. Moorer*, 12 T. C. 270. The payments at issue here were to stockholders only, in proportion to their stockholdings, and were made solely for the reason that the payees were stockholders. While petitioner makes much of the fact that the payments were pursuant to a contractual undertaking, such fact does not necessarily establish their status to be other than that of a dividend or similar distribution. Cf. *Fontana Power Co.* v. *Com-*

*missioner*, 127 F. 2d 193 (C. A. 9) ; *Northern Refrigerator Line, Inc.*, 1 T. C. 824.

To the extent that there existed earnings and profits available for the distribution of a dividend, the distribution in the case at bar appears to fall within the definition of a dividend contained in section 115 (a) of the Internal Revenue Code of 1939. To the extent that earnings and profits have been exceeded by the distribution, there has been a distribution of capital, with a corresponding reduction in the basis of the stock in the hands of each distributee. Sec. 115 (d), Internal Revenue Code of 1939.

We do not deem especially significant the fact that the participating agreements had originally been made with Underwriters as the obligor. The sum required by such agreements to be set aside consisted of 2 per cent of petitioner's gross premiums earned in respect of Indiana business and 1 per cent of gross premiums earned by petitioner in respect of all other business upon which a commission would be payable to Underwriters. The amounts to be set aside and eventually paid to petitioner's stockholders thus constituted 20 per cent of the commissions payable to Underwriters under the agency agreement.

The participating agreements in effect amounted to nothing more than Underwriters' agreeing to take a 20 per cent cut in its commissions so that the amount of the reduction could be paid over to petitioner's stockholders, thereby facilitating the sale of additional stock in petitioner.

Had petitioner and Underwriters agreed *inter sese* to a reduction in Underwriters' commissions and had petitioner agreed to pay to its stockholders the amount thus saved, there could be no serious question that the payments by petitioner to its stockholders would fail to qualify as deductible expenses. Yet, this was in substance, though not in form, the arrangement that was actually entered into and carried out. We do not deem it of any moment that petitioner made the payments to its stockholders after going through the form of assuming Underwriters' obligation, notwithstanding that there was a valid reason for canceling the contract between petitioner and Underwriters. The payments in question were not business expenses.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

TIETJENS, *J.*, dissenting: I respectfully dissent for the following reasons. The fact situation as I see it, reduces to this.

Petitioner's success was dependent upon the success of Underwriters in producing sufficient insurance sales to keep petitioner going. Underwriters, however, did not produce the business, and in order

for petitioner to survive it became necessary that the agency contract with Underwriters be canceled. As a result of negotiation, a cancellation agreement satisfactory to all concerned and approved by the Insurance Department and by the Securities Commission of the State of Indiana was concluded. One of the provisions of this agreement was the assumption by petitioner of Underwriters' obligation to make the payments here in question. It so happened that the persons to whom such payments were due were also stockholders of petitioner.

I do not think this latter fact affects the reality of the situation which is that petitioner became obligated to make the payments as part consideration for and under an arrangement which rid it of an otherwise onerous agency contract. The Commissioner does not argue that there was any sham about the cancellation arrangement or a lack of arms'-length negotiation. It had a plain business purpose for petitioner, i. e., to be "shut of" an unprofitable contract. That the termination of the contract was also advantageous to petitioner's stockholders is beside the point. I think the facts force the conclusion that the payment of the assumed obligations by petitioner was an ordinary and necessary business expense. *Louis C. Rollo*, 20 B. T. A. 799; *Camloc Fastener Co.*, 10 T. C. 1024; and cf. *Charles J. Williams*, 5 T. C. 639.

While, as the Commissioner argues, it may not generally be ordinary for a corporation to return to its stockholders the purchase price of their stock, that must depend on the circumstances. We think it is "ordinary" for a taxpayer to bring about the termination of a contract onerous to its business and to pay out money or assume obligations in order to bring about the termination and that is the crux of the transaction here. The cancellation of the agency contract was not a transaction between the petitioner and its stockholders, but was a transaction between the petitioner and the assignee of the agency contract. The assumption of the obligation which the agent corporation (Underwriters) had to the petitioner's stockholders was incidental to the cancellation and in part consideration thereof. I do not think the petitioner's deduction claims were prejudiced by these incidental ramifications.

JOHNSON and RICE, *JJ.*, agree with this dissent.