T.J. ENTERPRISES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 26276–91.     Filed December 16, 1993.

Lew E. Delo, for petitioner.
Jeffrey M. Wong, for respondent.

OPINION

RUWE, Judge: Respondent determined deficiencies in petitioner's Federal income taxes and additions to tax as follows:

| | | | Additions to tax | | |
| TYE | Deficiency | Sec. 6651(a) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6661 |
| --- | --- | --- | --- | --- | --- |
| 4/30/86 | $36,800.36 | N/A | $1,840.02 | 50% of the interest due on $36,800.36 | $9,200.09 |

| | | | Additions to tax | | |
| TYE | Deficiency | Sec. 6651(a) | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661 |
| --- | --- | --- | --- | --- | --- |
| 4/30/87 | $34,499.46 | $1,724.78 | $4,907.63 | 50% of the interest due on $55,775.62 | $13,943.91 |
| 4/30/88 | 24,099.75 | N/A | 1,445.39 | 50% of the interest due on $28,907.75 | 7,226.94 |

The issues for decision are: (1) Whether certain amounts paid to petitioner's majority shareholder constitute ordinary and necessary business expenses deductible under section 162(a);[1] (2) if not, whether such payments secured a long-term benefit properly characterized as an intangible asset amortizable over its useful life; and (3) whether petitioner is liable for additions to tax as determined by respondent.[2]

The parties submitted this case fully stipulated. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The parties have previously resolved or made concessions regarding several other issues, including additions to tax, raised by the notice of deficiency.

Petitioner is an Oregon corporation whose principal office is located in Portland, Oregon.

Petitioner is the franchisee in 17 H&R Block, Inc. (Block), franchise agreements. Through these exclusive agreements, petitioner has operated from 60 to 72 offices offering Block tax return preparation services in all the significant cities in Oregon and southwest Washington during the years at issue. Fourteen of these franchise agreements were assigned to petitioner in 1977 by the estate of the original franchisee, Theodore H. Johnson, who died in that year. Mr. Johnson's tax return preparation business was generally profitable prior to his death.

Under a stock redemption plan dated March 1, 1978, petitioner provided the funds to satisfy the $1,158,129 estate tax liability of Mr. Johnson's estate by redeeming 31 of the 100 shares held by Mr. Johnson's estate at a cost of $37,359 per share. In 1979, petitioner paid approximately $155,000 in Federal income tax deficiencies under an assessment for accumulated earnings tax liability.

When Mr. Johnson's estate closed, his wife, Barbara K. Johnson, became majority shareholder of petitioner, owning 42 shares. Six shares were placed in a stock redemption trust for the payment of Mr. Johnson's estate taxes. The remaining 21 shares were owned by Mr. Johnson's mother, Hillie S. Johnson, and his three children from a previous marriage. Subsequently, Mrs. Johnson acquired 4 shares owned by Hillie S. Johnson, for a price of $37,359 per share.

Dissension soon developed between petitioner and the three children. This adversely affected the operation of petitioner's business. In 1980, the individual minority shareholders agreed to allow petitioner to redeem their 17 shares at a purchase price of approximately $41,434 per share, for a total cost to petitioner of approximately $704,000 plus interest. Mrs. Johnson thereby became petitioner's sole shareholder.

By April 30, 1983, petitioner was experiencing cash-flow problems and showed a negative net worth of approximately $718,000 on its tax return. In the spring of 1983, petitioner's bank terminated petitioner's line of credit and demanded payment of its $1.25 million loan. After failing to find alternative bank financing, Mrs. Johnson, desiring to sell all her shares, began to look for a buyer for petitioner. In August

1983, Mrs. Johnson began negotiations with Tax & Estate Planners, Inc. (Tax Planners), an owner and operator of Block franchises. These negotiations were vigorous, protracted, and genuinely arm's length; both parties were represented by counsel at all material stages.

A key issue in the negotiations was the royalty paid by petitioner to Block. Petitioner held three franchises (the 5-percent franchises) requiring royalty payments of only 5 percent of gross receipts. Typically, Block requires a 10-percent royalty rate from its franchisees. Petitioner acquired the 5-percent franchises by assignment from the estate of Mr. Johnson, and they produced the great majority of petitioner's revenues. The remainder of petitioner's 17 franchises (including 11 assigned by Mr. Johnson's estate) required a minimum royalty payment of 10 percent of the gross receipts of the respective franchises (the 10-percent franchises).

The franchise agreements specified that in order to retain the favorable 5-percent royalty rate, the three franchises had to be owned by Mrs. Johnson, or a child or sibling of the original franchisee, Mr. Johnson, or a trust, corporation, partnership, or other entity controlled by said persons. If the franchises or the specified ownership interests were transferred or assigned in conflict with these terms, an "event of increase" would occur, causing the royalty rate to increase to 10 percent.

Tax Planners believed that retaining the 5-percent rate on the three franchises was crucial to petitioner's continued viability. Consequently, Tax Planners and Mrs. Johnson negotiated a stock sale agreement providing for: (1) The sale of 19 of Mrs. Johnson's 46 shares of petitioner's stock to Tax Planners; (2) Tax Planners' purchase of an option on the remaining shares of petitioner owned by Mrs. Johnson; (3) Tax Planners' management of petitioner's daily operations; (4) a loan from Tax Planners to petitioner for working capital; and (5) a consulting arrangement with Mrs. Johnson. For its management of daily operations,[3] Tax Planners was to receive an annual fee equal to 75 percent of petitioner's net pretax profit.[4] Also under the stock sale agreement, Tax

---

[3] Tax Planners has continuously been responsible for management of the daily operations since 1983.

[4] Tax Planners has received regular payments of this fee during every year since 1983, except in 1984, 1985, 1991, and 1992, when alternative arrangements were negotiated by petitioner

Planners was authorized to, and did, appoint two directors, a new president, and a new secretary/treasurer. Mrs. Johnson was authorized to, and did, appoint three directors.

To provide security for its working capital loan to petitioner,[5] Tax Planners took first- or second-priority liens on assets of petitioner and its subsidiaries, in addition to purchasing an option on Mrs. Johnson's remaining shares. This option gave Tax Planners a first right of refusal on those shares at a predetermined price. As consideration for the option, the stock sale agreement required Tax Planners to pay $1,400 per month to Hillie S. Johnson (Mr. Johnson's mother) for the rest of her life, then $1,000 per month to Mrs. Johnson for the rest of her life. The exercise price under the option was $915.79 per share, the same price at which Tax Planners had purchased its 19 shares.

Under the franchise agreements involved here, Block requires that a director or partner be listed as "Designated Principal", "who will personally assume and be bound by all the terms, covenants and conditions of" the agreements. Block may look to such individual, in addition to the business entity, for the proper performance of the franchise agreement.

The consulting arrangement provided that petitioner would pay Mrs. Johnson $100,000 per year in monthly installments to compensate her for (a) refraining from causing an "event of increase" (which would increase the royalty rate from 5 percent to 10 percent); (b) providing consulting services; (c) remaining as designated principal under the Block franchise agreements; and (d) her covenant not to compete against petitioner. Petitioner had the right to cancel and terminate all payments to Mrs. Johnson if she caused an "event of increase".

During a 5-year period, including the 3 years in issue, Mrs. Johnson received the following amounts through monthly installments:

---

and Tax Planners.

[5] Tax Planners has received regular loan repayments on the working capital loan to petitioner except in the years 1984, 1985, 1991, and 1992, when alternative arrangements were negotiated by petitioner and Tax Planners.

| Year ended | Amount |
|---|---|
| Apr. 30, 1986 | $100,000 |
| Apr. 30, 1987 | 95,000 |
| Apr. 30, 1988 | [1] 80,000 |
| Apr. 30, 1989 | 80,000 |
| Apr. 30, 1990 | 80,000 |
| Total | 435,000 |

[1] In 1987, Mrs. Johnson was diagnosed with an eye ailment that left her unable to perform many duties or act as designated principal under the Block franchise agreements. By agreement, the amount paid to her under the consulting arrangement was reduced by $20,000 per year. With the consent of Block, David Nelson, a principal of Tax Planners, was substituted as petitioner's designated principal in 1988.

During the same 5-year period, petitioner paid royalties to Block under the three 5-percent franchises totaling $883,474. If Mrs. Johnson had caused the royalty rate to double to 10 percent on the 5-percent franchises, due to an "event of increase", petitioner would have been required to pay an additional $883,474 (for a total of $1,766,948) in royalties to Block.

On its Federal income tax returns for the years in issue, petitioner reported the payments to Mrs. Johnson as follows:

| Year ended | Amount | Characterization |
|---|---|---|
| Apr. 30, 1986 | $100,000 | Legal and professional fees |
| Apr. 30, 1987 | 38,000 | Legal and professional fees |
| | 57,000 | Management service fees |
| Apr. 30, 1988 | 38,000 | Legal and professional fees |
| | 42,000 | Management service fees |

Of these payments, respondent allowed $20,000 per year as an ordinary and necessary business expense and disallowed the remaining payments. After receiving the notice of deficiency, petitioner filed a timely petition with this Court.

The parties have stipulated that, of the total amounts petitioner paid to Mrs. Johnson during each of the years in issue: (1) $20,000 per year (the amount allowed by respondent) was the value of Mrs. Johnson's services actually rendered as a consultant and designated principal and for her covenant not to compete; and (2) none of the remaining amounts paid to Mrs. Johnson constituted payments made for these services. We must decide whether petitioner may deduct these remaining payments under section 162(a).

Section 162(a) allows as a deduction "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". The question before us is essentially one of fact. *Walliser v. Commissioner,* 72 T.C. 433, 437 (1979). Respondent's determination bears a presumption of correctness, and the burden of proof rests with petitioner. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111, 115 (1933).

To qualify as an allowable deduction under section 162(a), an item must (1) be paid or incurred during the taxable year; (2) be for carrying on any trade or business; (3) be an expense; (4) be a necessary expense; and (5) be an ordinary expense. *Commissioner v. Lincoln Sav. & Loan Association,* 403 U.S. 345, 352 (1971). There is no real dispute in this case over requirements (1) and (2). The question here is whether the payments at issue were ordinary and necessary expenses.

"Necessary" expenses include those that are "appropriate and helpful" to the taxpayer's trade or business. *Welch v. Helvering, supra* at 113. The parties have stipulated that the excess of the payments over $20,000 each year was "made to promote TJE's profitability and reduce its expense of operating a tax return preparation franchise by avoiding greatly increased royalty expenses to Block." Tax Planners believed that retaining the 5-percent royalty rate on the three 5-percent franchises was crucial to petitioner's continued viability. Through payments to Mrs. Johnson of $335,000,[6] petitioner saved $883,474 in royalty fees over a 5-year period. Given these circumstances, we find that the full amount of the payments at issue was both appropriate and helpful to petitioner's trade or business.[7]

Expenses must also be "ordinary" to qualify for deduction under section 162(a). Respondent focuses on the unique nature of the payments in this case, noting that ordinary expenses must relate to a transaction "'of common or frequent occurrence in the type of business involved.'" *INDOPCO, Inc. v. Commissioner,* 503 U.S. ___, ___, 112 S. Ct. 1039, 1044 (1992) (quoting *Deputy v. du Pont,* 308 U.S.

---

[6] This amount is calculated by reducing the total payments to Mrs. Johnson by $20,000 each year over the period in question.

[7] Respondent's disagreement as to the "necessary" character of the payments is stated in conclusory fashion. Respondent agrees that the standard for whether expenses are necessary is a "clear, minimal" one.

488, 495 (1940)); see *Boser v. Commissioner,* 77 T.C. 1124, 1132 (1981) (ordinary expense must be "normal, usual, or customary") (amended 79 T.C. II), affd. in an unpublished opinion (9th Cir. 1983). However, this does not mean that an expenditure is deductible only when the taxpayer makes identical expenditures on a regular basis.

Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. Cf. *Kornhauser v. United States,* 276 U.S. 145. The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. At such times there are norms of conduct that help to stabilize our judgment, and make it certain and objective. The instance is not erratic, but is brought within a known type. [*Welch v. Helvering, supra* at 114.]

The origin of petitioner's liability to make payments to Mrs. Johnson was the royalty provision in the Block 5-percent franchise agreements. While the "event of increase" in this royalty provision is somewhat unique, the presence of a royalty provision in a franchise agreement is a "transaction * * * of common or frequent occurrence in the type of business involved." *Deputy v. du Pont, supra* at 495. Indeed, Block's common practice with its early franchisees had been to charge 5-percent royalty rates to induce development of Block's tax service business. Since 1973, Block's "form" franchise agreement has contained the "event of increase" provision involved herein. Thus, it appears that there was something quite "ordinary in the stimulus evoking" the payments here at issue. See *Welch v. Helvering, supra* at 114.

There was something ordinary "in the response" to that stimulus as well. See *id.* The parties have stipulated that the purpose of the payments at issue was to "promote TJE's profitability and reduce its expense of operating a tax return preparation franchise by avoiding greatly increased royalty expenses to Block." Petitioner's business is the operation of Block franchises. The payment of royalty fees (and the effort to minimize them) relates directly to that business. Royalties are one of the largest expenses incurred by petitioner and

other franchises, and they occur every month. Over a 5-year period, including the years in issue, petitioner saved $883,474 in royalty fees through payments to Mrs. Johnson of just $335,000. Had petitioner not made the payments, causing Mrs. Johnson to trigger an "event of increase", petitioner's royalty expenses would have doubled for the three 5-percent franchises. Undoubtedly, these extra royalty fees would have been deductible.

Franchisees in petitioner's business commonly make efforts to minimize royalty expenses. For example, under the 5-percent franchise agreements, the minimum royalty rate of 5 percent increases to 15 percent if the royalty fee is not paid within 8 days after the end of the reporting period. Every effort is made to make the payment within the 8-day period to avoid the 15-percent rate. Tax Planners has even borrowed money when necessary to make the payments on time for other franchises owned by it.

It is well established that expenses incurred to protect, maintain, or preserve a taxpayer's business, even though not in the normal course of such business, may be deductible as ordinary and necessary business expenses.[8] *Associated Milk Producers, Inc. v. Commissioner,* 68 T.C. 729, 742 (1977); see *United States v. E.L. Bruce Co.,* 180 F.2d 846 (6th Cir. 1950); *L. Heller & Son, Inc. v. Commissioner,* 12 T.C. 1109 (1949); *Catholic News Publishing Co. v. Commissioner,* 10 T.C. 73 (1948); *Miller v. Commissioner,* 37 B.T.A. 830, 832-833 (1938).

Expenditures designed to reduce costs are also generally deductible. See *Cassatt v. Commissioner,* 137 F.2d 745 (3d Cir. 1943) (payment of $346,524.06 for relief of lease obligations of $1,076,000 held deductible in year of payment, not amortizable over life of lease), affg. 47 B.T.A. 400 (1942); *Helvering v. Community Bond & Mortgage Corp.,* 74 F.2d 727, 728 (2d Cir. 1935) (payment to cancel unfavorable agency contract deductible as ordinary and necessary expense to prevent loss of earnings), affg. 27 B.T.A. 480 (1932); *Olympia Harbor Lumber Co. v. Commissioner,* 30 B.T.A. 114 (1934) (payment to terminate contract held par-

---

[8] No "separate and distinct additional asset" may be acquired by virtue of the expenditure sought to be deducted. See *Commissioner v. Lincoln Sav. & Loan Association,* 403 U.S. 345, 354 (1971); *Herman v. Commissioner,* 84 T.C. 120, 133 (1985). The parties agree that no separate and distinct additional asset resulted from the payments to Mrs. Johnson.

tially deductible as means of avoiding unfavorable contract without litigation), affd. 79 F.2d 394 (9th Cir. 1935). Petitioner's payments satisfy this line of cases, in that the payments were designed to reduce royalty fee expenses. There is nothing more ordinary and necessary than for petitioner to avoid an "event of increase", the activation of which would hinder profitable operation. See *Capitol Indem. Ins. Co. v. Commissioner*, 237 F.2d 901, 903 (7th Cir. 1956), revg. 25 T.C. 147 (1955).

This Court has previously allowed deductions under section 162(a) for payments quite similar to the ones in this case. In *Central Asphalt Paving Co. v. Commissioner*, T.C. Memo. 1968-225, one of the taxpayer's principal shareholders died, leaving his 20-percent interest in the taxpayer to his widow. The deceased shareholder had been an endorser of the taxpayer's bank credit line, and the bank insisted that the taxpayer furnish either collateral or an acceptable substitute endorser to replace the security which had been afforded by the decedent's endorsement. After the decedent's death, his widow sold the shares left to her back to the taxpayer, leaving her with no financial interest in the company. However, the taxpayer convinced the widow to become the substitute endorser for its credit line, and she agreed to do so in return for payments of $100 per week for the remainder of her life. This Court held that the payments "were ordinary and necessary business expenses of the * * * [taxpayer] under the provisions of section 162 * * * and are deductible by it." The Court noted that "surprisingly similar factual situations" were examined in *Monroe Sand & Gravel Co. v. Commissioner*, 36 B.T.A. 747 (1937), and *Long v. Commissioner*, 8 B.T.A. 737 (1927), and that the board had reached similar conclusions in those cases. See also *Fairmont Homes, Inc. v. Commissioner*, T.C. Memo. 1983-209 ("Payments made to induce a partner, shareholder or employee to take a course of action favorable to the payor-business are deductible.").

Despite the stipulation that the payments to Mrs. Johnson were made to "promote TJE's profitability and reduce its expense of operating a tax return preparation franchise by avoiding greatly increased royalty expenses to Block", respondent on brief argues that the payments were integral parts of an acquisition transaction. Respondent highlights Mrs. Johnson's original desire to sell her whole interest in

petitioner and Tax Planners' option on her remaining shares. It is true that the payments would not have been made in the absence of the events set in motion by Mrs. Johnson's initial desire to sell out. Despite her original intent, however, Mrs. Johnson did not sell out. She remained as *majority* shareholder, continued to perform significant services for petitioner, and continued to control the board of directors. Tax Planners, by contrast, became only a minority shareholder. After the first year, Tax Planners' status as primary manager of petitioner was subject to termination upon 60 days' written notice. Mrs. Johnson chose to retain a substantial financial and managerial stake in petitioner and continued to be subject to the risk corresponding to that stake.

Respondent also disputes the cost allocations in various portions of the stock sale agreement and its addenda, contending that nondeductible "lowball" stock and option prices were fixed to allow for increased deductible payments to Mrs. Johnson. According to respondent, the alleged misallocations support the conclusion that the payments to Mrs. Johnson were actually part of an acquisition transaction. As a basis for comparison, respondent points to stock sale and redemption prices near $40,000 per share in years just after Mr. Johnson's death.

Clearly, this is not a valid basis for comparison. The redemptions referred to by respondent were effected in response to dissension between petitioner and its minority owners. This dissension hampered petitioner's operating capability. The redemptions effectively siphoned off much of petitioner's capital and net worth. Previous redemptions to pay estate tax liabilities had done the same. At the time of the stock sale agreement between Mrs. Johnson and Tax Planners, petitioner was in dire financial straits and was experiencing cash-flow problems. Petitioner had a negative net worth of $718,000. Petitioner's bank had terminated its line of credit and demanded payment of its $1.25 million loan. Petitioner required approximately $2.2 million in working capital. Also, at that time there was the risk that Mrs. Johnson's death would result in an increase in the royalty rate. (In 1988, a trust was organized to prevent this from occurring.) Mrs. Johnson initially made an unsolicited offer to sell all her shares in petitioner for $40,000 to $50,000. Divided by 46 shares, this results in an offer to sell for

$869.57 to $1,086.96 per share. Compared to this range, the ultimate sale (and option) price of $915.79 per share for a minority stake cannot be regarded as "lowball".[9]

This is not a case in which the payments to Mrs. Johnson "enabled 'stockholders' to accomplish a result which they personally desired but which was of dubious value to the corporation." See *Schalk Chem. Co. v. Commissioner*, 304 F.2d 48, 53 n.8 (9th Cir. 1962), affg. 32 T.C. 879 (1959). The payments to Mrs. Johnson had independent and substantial importance for petitioner.[10] At the time of the stock sale agreement, petitioner had a negative net worth and was experiencing cash-flow and credit problems. Tax Planners believed maintenance of the 5-percent royalty rate was crucial to *petitioner's* viability as a business. The benefits from the low rate inured first to petitioner, helping to minimize expenses and ensure survival.

Respondent argues in the alternative that the payments to Mrs. Johnson should be capitalized because they produced "significant benefits * * * that extended beyond the tax year in question". See *INDOPCO, Inc. v. Commissioner*, 503 U.S. ___, ___, 112 S. Ct. 1039, 1045 (1992). We disagree. Mrs. Johnson had the power to cause an "event of increase" at any time by selling or transferring her stock to persons unrelated to her deceased husband.[11] The payments were made

---

[9] It is undisputed that the sale negotiations were vigorous, protracted, and genuinely arm's length. Generally, a contractual allocation will be upheld if it has "some independent basis in fact or some arguable relationship with business reality such that reasonable men, genuinely concerned with their economic future, might bargain for such an agreement." *Schulz v. Commissioner*, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960); *Landry v. Commissioner*, 86 T.C. 1284, 1307 (1986). In light of this and the factors listed above, we consider the stock and option prices negotiated to be reasonable and correctly allocated.

[10] For this reason, we believe *Kalamazoo Oil Co. v. Commissioner*, T.C. Memo. 1981-344, affd. 693 F.2d 618 (6th Cir. 1982), is distinguishable from this case. In that case, this Court held that lifetime payments made by the corporate taxpayer to a shareholder were nondeductible. The payments were purportedly for a covenant not to compete and were negotiated in connection with a gradual redemption of all the shareholder's stock. The shareholder was elderly, and the lifetime payments were to extend well beyond the years in which he might compete with the taxpayer. Thus, the service for which the shareholder was paid (noncompetition) was likely to be "performed" in any event because of the shareholder's age. In addition, the sales price for the shareholder's stock was found to be inadequate.

By contrast, the payments in this case were made for the stipulated purpose of inducing Mrs. Johnson to refrain from causing an "event of increase". This was vitally important to petitioner. Mrs. Johnson also remained a very active and useful part of petitioner's business in other respects until physical ailments restricted her participation, at which time the monthly payments to her were reduced.

[11] Tax Planners had an option giving it the first right to purchase Mrs. Johnson's stock in the event she wished to sell. Had Tax Planners exercised this right, the resulting sale to Tax Planners would have been an event of increase.

monthly in order to compensate Mrs. Johnson for "refraining from causing an 'Event of Increase'" and "to promote TJE's profitability and reduce its expense of operating a tax return preparation franchise by avoiding greatly increased royalty expenses". Pursuant to the agreement between petitioner and Mrs. Johnson, the payments were to be made only for so long as she refrained from causing an "event of increase".[12]

We conclude that respondent's view of the payments and stock sale transaction does not comport with the form or substance of the actual events. The tax consequences in this case follow the actual economic risks and incentives arising out of the transaction and payments. The payments at issue were an ordinary and necessary response to a "stimulus" that was a common part of petitioner's business. As such, the payments to Mrs. Johnson made by petitioner are deductible under section 162(a).[13]

*Decision will be entered under Rule 155.*

---

[12] We also reject respondent's contention that the payments to Mrs. Johnson were disguised dividends. The payments were not contingent upon petitioner's earnings or profitability. While Mrs. Johnson had the ability to refrain from causing an "event of increase" simply by holding onto her shares, her continued ownership was not the only means available. Mrs. Johnson could have sold or otherwise transferred the shares to a sibling or child of Mr. Johnson or transferred them to a trust of which she, or a sibling or child of Mr. Johnson was the beneficiary. She did in fact transfer her shares to a revocable trust in 1988 without causing an "event of increase". Thereafter, Mrs. Johnson was entitled to continue receiving the monthly payments from petitioner.

[13] As a result of our decision, it follows that petitioner is not liable for any additions to tax attributable to deductions for the amounts paid to Mrs. Johnson.