Robert I. INGALLS, Jr., and Jane S. Ingalls, Plaintiffs,

v.

George D. PATTERSON, District Director of Internal Revenue for the District of Alabama, Defendant.

Civ. A. No. 8503.

United States District Court
N. D. Alabama, S. D.

Jan. 17, 1958.

**628**

Pritchard, McCall & Jones, Birmingham, Ala., for plaintiffs.

W. L. Longshore, U. S. Atty., and M. L. Tanner, Asst. U. S. Atty., Birmingham, Ala., and Charles K. Rice, Asst. Atty. Gen., James P. Garland, Homer R. Miller, and Attys., Dept. of Justice, Washington, D. C., Anthony R. DeSanto, Alexandria, Va., for defendant.

LYNNE, Chief Judge.

This action was tried to the court, without the intervention of a jury, on the issues tendered by the pleadings and the proof, consisting of the stipulation of facts entered into by and between the parties, oral testimony of witnesses, and the documentary evidence adduced at the trial.

It was agreed by all of the parties at the pretrial conference and the formal order on pretrial hearing provided that the following were all of the issues in controversy in this cause:

"Count 1. (Tax Year 1950) Plaintiffs claim of defendant $45,-722.89, with interest, as refund of income taxes for the year 1950. It is plaintiffs' contention that the Commissioner erred in disallowing for such year a deduction of $125,-000.00 for attorneys' fees expended by plaintiff in connection with litigation involving the Ingalls companies. It is plaintiffs' theory that such fees were deductible either under 26 U.S.C.A. § 23(a) (1) or § 23 (a) (2).

"Count 2. (Tax Year 1951) Plaintiffs claim $18,179.28, with interest, as refund of income taxes for the year 1951 because of the erroneous disallowance of deduction for attorneys' fees of $23,200.00 for such year, as in Count 1.

"Count 3. (Tax Year 1952) Plaintiffs claim $27,085.45, with interest, due to the disallowance of a deduction of $28,725.00 for attorneys' fees for such year, as in Count 1.

"Count 4. (Tax Year 1953) Plaintiffs claim of defendant $174,-624.26, with interest, due to the disallowance of a deduction for attorneys' fees in the amount of $100,-877.78 for such year, as in Count 1.

"With respect to each of the foregoing claims, defendant insists that the expenditure for attorneys' fees did not represent either a proper business or ordinary deduction, but constituted a capital expenditure.

"(Count 4, continued) Plaintiffs contend, in addition, that the Commissioner erred in including the sum of $50,000 in plaintiffs' income for 1953, in which year Ingalls Iron Works Company reimbursed plaintiffs for attorneys' fees in such amount which plaintiffs had previously paid on behalf of such corporation. Plaintiffs insist, and defendant denies, that it was the corporation's obligation to pay the fee in the stockholders' derivative action concerned.

"In addition, plaintiffs contend that a deduction in the amout of $15,000 for fees paid to attorneys for Bob Ingalls' divorced wife in connection with the dismissal of her crossclaim against him for alimony was erroneously disallowed. Plaintiffs' theory is that such fee was deductible either under 26 U.S.C.A. § 23(a) (2) or § 23(k) or § 23(u). Defendant insists that such fee represented capital expenditure.

"In addition, plaintiffs contend that there was erroneously included in plaintiffs' income the sum of $10,-092.59 as income to plaintiffs from Trust "A". Plaintiffs insist that such amount was not received from such trust, which defendant admits, and further contend that it was not

distributable therefrom in 1953, which defendant denies."

Because of the ultimate conclusions reached by the court and its desire to limit its holdings to the precise facts of this case, the full stipulation of facts (without reproduction of the exhibits thereto) entered into by the parties and which the court finds as and to be facts is reproduced in the margin.[1]

### Stipulation

It is stipulated and agreed by and between the parties hereto through their respective attorneys that the following facts are true and correct, and may be received in evidence in this case, subject to objection by either party on the ground of irrelevancy or immateriality, and subject to the rights of either party to introduce further evidence not inconsistent with any fact stipulated.

1. Plaintiffs are residents of the State of Alabama, each over the age of twenty-one years, and they filed their income tax returns for the years 1950, 1951, 1952 and 1953 with the District Director of Internal Revenue for the District of Alabama at Birmingham, Alabama.

2. The Defendant, George D. Patterson, was throughout the year 1956 and is now the duly appointed and acting District Director of Internal Revenue for the District of Alabama.

3. Plaintiffs paid to the Defendant as additional income taxes and interest on or about July 30, 1956 the following:

    a. For 1950 $45,722.89
    b. For 1951 $18,179.29
    c. For 1952 $27,085.45
    d. For 1953 $174,624.26

4. A true copy of the report of the Revenue Agent, Elizabeth Dalrymple, which shows the basis for the assessments of the additional taxes referred to in the foregoing paragraph is attached hereto and and made part hereof, and marked Exhibit "A".

5. Plaintiffs filed claims for refund on the 14th day of August 1956 for the additional taxes paid as aforesaid, true copies of which are attached to the complaint herein as Exhibits "A", "B", "C" and "D".

6. On September 18, 1956 the Commissioner of Internal Revenue notified Plaintiffs by registered mail of the disallowance of each of said claims.

7. Plaintiff, Robert I. Ingalls, Jr., paid legal fees to Francis H. Hare or Charles W. Greer, Attorneys at Law, Birmingham, Alabama, which were disallowed as deductions in computing Plaintiff's federal income taxes for the years 1950, 1951, 1952 and 1953 as follows:

| Year | Date Paid | Amount |
|------|-----------|--------|
| 1950 | June 29, 1950 | $125,000.00 |
| 1951 | July 17–Dec. 17, 1951, incl. | 23,200.00 |
| 1952 | During year 1952 | 28,725.00 |
| 1953 | During year 1953 | 100,877.78 |

Note: Of the fees paid for the year 1952, the sum of $1,225.00 of said amount was paid to the law firm of Pritchard, McCall and Jones, Birmingham, Alabama, Fowler, Long and Fowler, Attorneys at Law, Knoxville, Tennessee, and Jerome G. Taylor, Attorney at Law, Knoxville, Tennessee. Said fees of $1,225.00 as aforesaid, relate to the preparation of a legal opinion by Pritchard, McCall and Jones which was rendered on July 14, 1952, a true copy of which opinion is attached hereto, made a part hereof, and marked Exhibit "B".

8. During the year 1953 Plaintiff, Robert I. Ingalls, Jr., was reimbursed by Ingalls Iron Works in the amount of $50,000 for attorneys fees, which sum of $50,000 was added to Plaintiff's taxable income in computing Plaintiff's income taxes for the year 1953. Of the sum of $50,000 as aforesaid, $25,000 was paid by Robert I. Ingalls, Jr. to Francis H. Hare, and $25,000 was paid to Charles W. Greer in the year 1953.

9. Plaintiff, Robert I. Ingalls, Jr., in the spring of 1948 was President of The Ingalls Iron Works Company and Vice-Chairman of the Board of Directors of The Ingalls Shipbuilding Corporation, a wholly owned subsidiary of the Iron Works Company, and was a member of the Board of Directors of both corporations. He had held these positions continuously for approximately seven years. Mr. Ingalls, Jr. drew a total of $45,000 per year as compensation. The stock paid dividends of $5 per share, each year 1943–1947.

10. Ownership of the voting stock of The Ingalls Iron Works Company in May 1948 was:

| Owner | No. of Shares |
|-------|--------------|
| R. I. Ingalls, Jr. | 4,501 |
| R. I. Ingalls, Sr. | 2,287 |
| Mrs. Ellen Gregg Ingalls | 1,407 |
| Elesabeth Ingalls | 55 |
| Trusts A, B, C, D, E, F, G. Total | 6,750 |
| Total | 15,000 |

11. The following is a description of various Trusts and Statement of stock ownership of each in Ingalls Iron Works Company:

| | Number Shares Voting Stock |
|---|---|
| "A" Created 4-1-32 | 1,000 |
| Grantor—R. I. Ingalls, Sr. | |
| Beneficiaries—Robert I. Ingalls, Jr. and Ellen Gregg Ingalls. | |
| Trustees—First National Bank of Birmingham—Robert I. Ingalls, Jr. and Ellen Gregg Ingalls | |
| "B" Created 12-31-38 | 1,250 |
| Grantor—Robert I. Ingalls, Sr. | |
| Beneficiaries — Elesabeth and Barbara Ingalls | |
| Trustees—First National Bank, Birmingham; Birmingham Trust National Bank, successor to First National; Hamilton National Bank, Chattanooga, Tennessee, successor to Brimingham Trust | |
| "C" Created 12-13-38 | 500 |
| Grantor—Ellen Gregg Ingalls | |
| Beneficiaries — Elesabeth and Barbara Ingalls | |
| Trustees—Robert I. Ingalls, Jr. and First National Bank of Birmingham | |
| "D" Created 12-31-38 | 500 |
| Grantor, Robert I. Ingalls, Jr. | |
| Beneficiaries — Elesabeth and Barbara Ingalls | |
| Trustees—First National Bank of Birmingham and Robert I. Ingalls, Jr. (Eleanor Flick Stone present trustee) | |
| "E" Created 12-27-41 | 1,000 |
| Grantor—R. I. Ingalls, Sr. | |
| Beneficiary—Elesabeth and Barbara Ingalls | |
| Trustees—First National Bank of Birmingham, Ellen Gregg Ingalls and Robert I. Ingalls, Jr. | |
| "F" Created 3-15-43 | 2,000 |
| Grantor—Robert I. Ingalls, Jr. | |
| Beneficiaries — Elesabeth and Barbara Ingalls | |
| Trustees—Ellen Gregg Ingalls, M. F. Pixton and Robert I. Ingalls, Jr. | |
| "G" Created 3-15-43 | 500 |
| Grantor—Ellen Gregg Ingalls | |
| Beneficiaries — Elesabeth and Barbara Ingalls | |
| Trustees—M. F. Pixton, Robert I. Ingalls, Jr. and R. I. Ingalls, Sr. | |

12. R. I. Ingalls, Sr. was the founder of The Ingalls Iron Works Company and served as its chief executive officer until his death on July 12, 1951.

13. During March or April, 1948 a controversy arose between R. I. Ingalls, Sr. and his son as a result of which R. I. Ingalls, Sr., on or about May 10, 1948 undertook to discharge his son as President of Ingalls Iron Works Company, ordered him off of the Company's premises, and as chief executive officer of The Ingalls Iron Works Company, stopped further payment to him of his compensation.

14. The Ingalls Iron Works Company was a Delaware corporation, governed by a board of directors. In 1948 the directors were R. I. Ingalls, Sr., Robert I. Ingalls, Jr., Ellen Gregg Ingalls, M. F. Pixton, and W. R. Guest, the latter two being employees of the company and owning none of its stock.

15. It is stipulated and agreed that the court may take judicial notice of the provisions of Volume 4, Delaware Code Annotated, and that either party to this action may refer to any provisions appearing in said code in their briefs or arguments in this case. The Plaintiff invites the court's attention, particularly to Sections 141, 142 and 224 of Title 8 of said Code, which were in effect during the years involved in this action. True copies of said sections are attached hereto, made a part hereof, and marked Exhibit "C".

16. A true copy of a letter from the Plaintiff, Robert I. Ingalls, Jr., to his father, Robert I. Ingalls, Sr., dated May 12, 1948 is attached hereto, made a part hereof, and marked Exhibit "D".

17. True copies of the various Trust instruments known as Trusts "A", "B", "C", "D", "E", "F" and "G" are attached hereto, made a part hereof and marked Exhibits "E-1", "E-2", "E-3", "E-4", "E-5", "E-6" and "E-7".

18. The instruments creating Trusts "F" and "G" required the two remaining Trustees to administer them in the event of the resignation of M. F. Pixton, one of the Trustees. The First

National Bank of Birmingham, Alabama had consented to succeed M. F. Pixton as Co-Trustee.

19. Counsel for Robert I. Ingalls, Jr. in May 1949 withdrew their client's consent to the proposed change of trustees and petitioned the court to accept Mr. Pixton's resignation but to order the two remaining trustees to proceed to administer the trusts as the trust indentures provided.

20. It is stipulated that this court may take judicial notice of the following decisions by the Supreme Court of Alabama:

a. Ingalls Iron Works Co. v. Ingalls, 256 Ala. 124, 53 So.2d 847, decided June 30, 1951.

b. Ingalls v. Ingalls, 256 Ala. 321, 54 So.2d 296, decided June 28, 1951.

c. Ingalls v. Ingalls, 257 Ala. 521, 59 So.2d 898, decided June 26, 1952.

21. True copies of minutes of meetings of Board of Directors of The Ingalls Iron Works Company held on November 9, 1948, February 25, 1949, July 17, 1951, September 22, 1952 and September 23, 1952, are attached hereto and made parts hereof, and marked Exhibits "F–1", "F–2", "F–3", "F–4" and "F–5".

22. True copies of minutes of the meetings of stockholders of The Ingalls Iron Works Company held on February 25, 1949, January 8, 1952 and September 19, 1952 are attached hereto and made parts hereof, and marked Exhibits "G–1", "G–2" and "G–3".

23. Robert I. Ingalls, Jr. obtained a preliminary injunction in said suit No. 77440 restraining the trustee-stockholders of Ingalls Trusts "A", "B", "C", "D", "E", "F" and 'G" from voting in favor of any motion or resolution whose adoption would directly or indirectly result in his removal as a director of said corporation. After a hearing the lower court dissolved said injunction and its action was sustained by the Supreme Court of Alabama.

24. It is stipulated and agreed that either of the parties to this action may offer in evidence either the original papers or copies thereof filed in any of the following suits or actions filed in Circuit Court of Jefferson County, Alabama as follows, subject to the objection by either party on the ground of irrelevancy or immateriality of any paper offered:

76528 — Pixton v. Ingalls
76529 — Pixton v. Ingalls
76919 — Ingalls, Jr. v. Ingalls, Sr.
77440 — Ingalls, Jr. v. Ingalls, Sr.

78707 — Ingalls, Jr. v. First National Bank
78710 — Ingalls, Jr. v. Ingalls, Sr.
81902—Ingalls Iron Work v. Ingalls, Jr.
78480 — Ingalls, Jr. v. First National Bank
85705 — First National Bank v. Ingalls Iron Works
85141 — Elesabeth Ingalls a minor by her Guardian v. M. L. Pixton
80667 — Ingalls, Sr. v. Ingalls, Jr.
76836 — 76842, inclusive—Ingalls, Jr. v. Ingalls, Sr.
24118 — Ingalls, Jr. v. Ingalls Iron Works Company
18321 — Ingalls, Jr. v. Ingalls, Sr.
17946 — Ingalls, Jr. v. Ingalls, Sr.
23399 — Elesabeth Ingalls v. Ingalls, Sr.
72370 — Ellen R. Ingalls v. Ingalls, Jr.

The original papers or copies thereof in any court actions in any courts relating to the subject matter of this action may be offered in evidence by either party, subject to objections on the ground or irrelevancy or immateriality.

25. R. I. Ingalls, Sr., was a member of the board of directors of the First National Bank. The Ingalls Iron Works Company was one of the bank's largest depositors. M. F. Pixton, as stated, was an employee of The Ingalls Iron Works Company of which R. I. Ingalls, Sr., was chief executive officer. Ellen Gregg Ingalls filed in the Circuit Court of Jefferson County, Alabama, Equity Division, a proceeding to show R. I. Ingalls, Jr. was mentally incompetent to serve as a trustee; and in connection with that suit she took the deposition of a physician. It was styled "Proceedings to Perpetuate Testimony of Dr. Seale Harris", case No. 82004, Circuit Court, Jefferson County, Alabama, Equity Division. Robert I. Ingalls, Jr. successfully resisted this petition after Dr. Harris had been examined as a witness.

26. Distributions to the beneficiaries of Trusts "A" to "G", inclusive, were withheld and not made as to trust income therefrom from May 15, 1948 until the summer of 1950.

27. In the decree rendered in cases Nos. 78707 and 78710, entitled Ingalls, Jr., Guardian v. Ingalls, Sr. and Others, and Ingalls, Jr., Guardian v. First National Bank, Chancellor E. M. Creel of the Circuit Court of Jefferson County, Alabama in Equity, as part of his decree rendered on November 15, 1950 stated as follows:

"Charges were made and some of the evidence tends to show that after the break, the influence of R. I. Ingalls, Sr. over all of the trustees prevented funds from being paid to the beneficiaries of the trusts. This, of course, was denied. However, the fact remains that funds were not forthcoming except belatedly and after efforts to fix unwarranted conditions in Trust 'A'. In Trusts "F" and "G" payments were started very recently after suit had been filed by certain trustees for a construction of the several trusts and the court had ruled that disbursements of income were mandatory."

28. In said suits Nos. 78707 and 78710, complaint alleged other misconduct on the part of the trustees of the Ingalls trust estates. Twenty Thousand Dollars ($20,000) of Trust "C" funds were invested in Coosa River Newsprint stock without the knowledge of co-trustee Robert I. Ingalls, Jr. Two Thousand Dollars ($2,000) of Trusts "F" and "G" funds were paid to attorneys without the knowledge of co-trustee, Robert I. Ingalls, Jr. Trust "A" stock was improperly voted over the protest of co-trustee Robert I. Ingalls, Jr.

29. Plaintiffs rely particularly upon the following extract from the opinion of the Supreme Court in Ingalls v. Ingalls, 59 So.2d 898, 908, which states as follows:

"We are not inclined to disagree with the finding of the trial court to the effect * * * that the primary motive behind the struggle between father and son was the desire on the part of the elder Ingalls *to retain control* over Ingalls Iron Works Company and the desire of the younger Ingalls *to regain his position with that company;* that in the struggle that each seek to use the stock of the company to accomplish their objectives."

* * * * *

"His desire to regain his position with the Ingalls Iron Works Company, with which he was so long associated and in which he owns more stock than any other individual, is, of course, understandable."

30. In reversing the two cases, the Supreme Court restored Robert I. Ingalls, Jr. as trustee of the estate from which he had been removed, although he did not ask for such a restoration. The other trustees, except R. I. Ingalls, Sr., removed by the lower court were also restored. The latter's death before the suits were finally decided made moot the question of his fiduciary misconduct.

31. At the annual meeting of the stockholders of The Ingalls Iron Works Company on the second Tuesday in January 1952, no business was transacted and no election of directors was held.

32. At the first meeting of the directors after Robert I. Ingalls, Jr. had been restored to the board, the directors unanimously elected him Chairman of the Board at a salary of $50,000 per year.

33. Subsequently, and upon the resignation of Mr. Gayle as President, Robert I. Ingalls, Jr. was elected President of The Ingalls Iron Works Company and Chairman of the Board of the Ingalls Shipbuilding Corporation and became chief executive officer of both corporations and is now serving in those capacities.

34. In cause 81902, Ingalls Iron Works Company v. Ingalls, 53 So.2d 847, The Ingalls Iron Works Company claimed that the discharge of Robert I. Ingalls, Jr. as its president, and the subsequent failure to elect him as a director, had brought about his "retirement" within the meaning of the agreement entered into by the three stockholders on April 15, 1943, and that for such reason the Company had acquired the right to purchase his 4501 shares of stock at a price of approximately $470 per share as fixed in the mutual agreement of the three stockholders. The suit sought to compel Robert I. Ingalls, Jr. to sell his stock to the corporation at that figure.

35. True copies of the certified audits made by Price-Waterhouse Company and/or by Ernst and Ernst, Certified Public Accountants, for the year 1943 and the years 1947–1953, inclusive, are attached hereto, made parts hereof and marked Exhibits "H-1", "H-2", "H-3", "H-4", "H-5", "H-6", "H-7" and "H-8".

36. A schedule showing dividends paid by The Ingalls Iron Works Company to its stockholders for the years 1935–1956, inclusive, is attached hereto and made a part hereof, and marked Exhibit "I".

37. A schedule showing the names of the statutory officers, directors and stockholders for The Ingalls Iron Works Company for the years 1947–1953, inclusive, is attached hereto, made part hereof and marked Exhibit "J".

38. A schedule showing the salaries paid to statutory officers of The Ingalls Iron Works Company for the years 1947–1956, inclusive, is attached hereto, made a part hereof and marked Exhibit "K".

Through the genius, diligence and perseverance of Robert I. Ingalls, Sr., the closely held and family owned corporation, The Ingalls Iron Works Company,[2] had achieved a position of pre-eminence in the industrial economy of Alabama. At the beginning of the year 1948, Robert I. Ingalls, Jr., was president of the

39. Robert I. Ingalls, Sr. died testate on July 12, 1951. His will was admitted to probate in the Probate Court of Jefferson County, Alabama in August 1951. A true copy of said will is attached hereto, made a part hereof, and marked Exhibit "L".

40. Suit No. 85141 was brought by Elesabeth Ridgely Ingalls, by her guardian Robert I. Ingalls, Jr., and Robert I. Ingalls, Jr., as stockholders and on behalf of all other stockholders who may make themselves plaintiffs and that Barbara Ingalls was later added as a party to said suit through her guardian, Robert I. Ingalls, Jr., and as an individual. Said suit was instituted to prevent the cancellation of the option contract of April 15, 1943, relating to the stock of Robert I. Ingalls, Sr., and to declare a resolution canceling it to be null and void; to require Elesabeth Ingalls and M. F. Pixton, as Directors, to elect directors to succeed Robert I. Ingalls, Sr.; to require collection of insurance policies, referred to in said option contract, and to order a reference to fix attorney fees to be paid attorneys for complainants for services to be paid by the corporation.

41. Shortly after the death of Robert I. Ingalls, Sr., Ellen Gregg Ingalls and M. F. Pixton were the only two surviving directors of the Ingalls Iron Works Company and that an injunction was obtained restraining the delivery of the stock of Robert I. Ingalls, Sr., to the executors of his estate and restraining the company from using the proceeds of the insurance policies for any purpose other than purchasing the stock.

42. The defendant and the examining revenue agents disallowed the attorney fees involved in this action as deductions for the reason that none of said attorneys' fees were held to be allowable as deductions as a matter of law and fact, and hence defendant and the examining revenue agents did not consider it necessary to consider the question of the reasonableness of said fees, and did not discuss the question of the reasonableness with the taxpayer.

43. Robert I. Ingalls, Jr. paid legal fees of $15,000.00 in 1953 to attorneys for his divorced wife, and such fees were reasonable and were paid pursuant to decree of the Circuit Court of Jefferson County, Alabama.

44. A true copy of the Articles of Incorporation of The Ingalls Iron Works Company is attached hereto, made a part hereof, and marked Exhibit "M".

45. A true copy of the By-laws of The Ingalls Iron Works Company as they were in effect for the years 1947–1953, inclusive, is attached hereto, made a part hereof and marked Exhibit "N".

46. A true copy of an agreement dated April 15, 1943 between Robert I. Ingalls, Jr., Robert I. Ingalls, Sr. and Ellen Gregg Ingalls relating to the shares of stock held by each in Ingalls Iron Works Company upon the death or retirement of any of the stockholders is attached hereto, made part hereof and marked Exhibit "O".

47. A true copy of a letter dated January 29, 1953 and attached statement of charges for legal services performed by Francis H. Hare from Wilkinson and Skinner, Attorneys at Law, to Robert I. Ingalls, Jr. is attached hereto, made a part hereof and marked Exhibit "Q".

48. A true copy of a written agreement between Robert I. Ingalls, Jr., Francis H. Hare and Charles W. Greer dated August 4, 1950 is attached hereto, made a part hereof and marked Exhibit "R".

49. A true copy of a letter dated July 28, 1950 from H. Herzberg, Jr., Certified Public Accountant, to Francis H. Hare, Attorney at Law, is attached hereto, made a part hereof, and marked Exhibit "S", and a copy of a reply thereto by Francis H. Hare to H. Herzberg, dated August 4, 1950, is attached hereto and made a part hereof and marked Exhibit "T".

50. True copies of releases signed by Francis H. Hare on June 4, 1953 and by Charles W. Greer on June 3, 1953 are attached hereto, made parts hereof and marked Exhibit "W–1" and "W–2".

M. L. Tanner

---

Assistant United States Attorney
Attorney for Defendant

---

William S. Pritchard
Winston B. McCall

---

Attorneys for Plaintiffs

2. Frequently referred to herein as the corporation.

Ingalls Iron Works Company and vice-chairman of the Board of Directors of the Ingalls Shipbuilding Corporation, a wholly owned subsidiary, and was a member of the Board of Directors of both corporations. These positions he had held continuously for approximately seven years and for his services in such capacities he was paid an aggregate compensation of $45,000 per year. During the same period of time he received dividends of $5 per share on his stock therein.

In the early part of 1948, a serious personal disagreement arose between Robert I. Ingalls, Sr., the chief executive officer of the corporation, and his son, Robert I. Ingalls, Jr. Because this disagreement triggered the multiple and protracted litigation with which the larger claims for refund in this case are concerned, it is essential that its nature and effects be touched upon briefly.

Because Mr. Ingalls, Sr., is now deceased, this court is impelled by a sense of delicacy to emphasize that it is not undertaking to place the accent of blame on either father or son. Any slanting of this opinion in the direction of the son is necessarily to be explained by the fact that it is his own individual lawsuit with which this court is concerned.

Mr. Ingalls, Sr., was strongly opposed to his son's expressed intention to marry his present wife. He threatened that if such marriage were consummated against his wishes, he intended to starve his son into submission by cutting off his income from all sources. When son refused to be dictated to by father as to whom he should or would be married, and did in fact marry the lady to whom his father objected, discord between them culminated on or about May 10, 1948, when Mr. Ingalls, Sr., undertook to discharge his son as president of the corporation, ordered him from its premises, and discontinued payment to him of his compensation.

An abortive effort was made to effect a reconciliation between father and son. Thereafter, Mr. Ingalls, Jr., employed Francis H. Hare, a resourceful, able and honorable attorney, to perform whatever legal services might be required to regain for him his former executive position with the Ingalls companies, to maintain successful action for compensation for personal services since May 15, 1948, and to effect an increase in dividends paid on the stock of Ingalls Iron Works Company. Shortly thereafter, Mr. Charles W. Greer, a skillful and respected member of the Birmingham Bar, became associated with Mr. Hare in the representation of Mr. Ingalls, Jr.[3]

3. A contract was entered into between attorneys and client on August 4, 1950 which was intended to embrace all litigation then pending or in immediate prospect. It is obvious that some of the litigation which subsequently ensued was not within its terms. Such contract provided as follows:

"Agreement Between Robert I. Ingalls, Jr., Francis H. Hare, and Charles W. Greer

"1. Robert I. Ingalls, Jr., agrees to pay Francis H. Hare and Charles W. Greer the sum of $125,000.00 for all litigation now pending or which may follow in connection with my efforts to get back my position as President of the Ingalls Iron Works Company.

"2. Francis H. Hare and Charles W. Greer are to divide between them as they may agree or as they have agreed, the $125,000.00. Each of them may decide for himself as to how he wants his share paid.

"3. Any fees allowed by the Court out of the trusts are not to be deducted herefrom.

"4. The $125,000.00 is to cover all present litigation and all future litigation whether brought by me or against me in connection with my efforts to get back with the company.

"5. It is agreed that I have already paid $125,000.00 for the legal services as set out in Mr. Herzberg's letter to Mr. Hare as of July 28, 1950.

"6. It is also understood that I am not in a financial position to pay the balance of $125,000.00 in cash or within the near future and that the best I can do is to pay it in five annual payments, beginning in the year 1951 and I agree to pay it on that basis and you agree to accept it. The unpaid balance will bear interest at 2¼%.

On November 1, 1948, Mr. Hare, in behalf of Mr. Ingalls, Jr., individually and as president of the corporation, filed a bill of complaint in equity against Mr. Ingalls, Sr., including prayers that Mr. Ingalls, Sr. be enjoined from interfering with Mr. Ingalls, Jr., in performing his functions as president and that his salary be paid. The theory underlying this bill was that under the controlling laws of Delaware, the chairman of its board of directors had no authority to discharge the president of a corporation; that the term of office of Mr. Ingalls, Jr., as president did not expire until the second Tuesday in January, 1949; the Delaware law provides that a president cannot be removed until his office has expired except for cause, and that cause must be established in a suit at law brought in behalf of the board of directors.

Thereafter, on November 9, 1948, at a called meeting of the Board of Directors of the corporation, over which Mr. Ingalls, Sr. presided as chairman, the directors present, Ellen Gregg Ingalls, wife of Mr. Ingalls, Sr., and mother of Mr. Ingalls, Jr., W. R. Guest, and M. F. Pixton, unanimously adopted a resolution ratifying the father's action in discharging his son and declaring the tenure of the son's office to have ceased as of May 15, 1948. Mr. Ingalls, Sr., was named to serve as president in his stead.

On February 25, 1949, the stockholders of the corporation, at an adjourned annual meeting, elected Mr. Ingalls, Sr., Mrs. Ellen Gregg Ingalls and Mr. M. F. Pixton as directors. The by-laws of the corporation were amended to provide for only three directors. Mr. Ingalls, Jr., was nominated for the office of director but was defeated after receiving the votes of his stock only.

After February 29, 1949, the extremity of the position of Mr. Ingalls, Jr., was quite apparent. Since he had failed in election as a director, he could not, under the laws of Delaware, serve as president of the corporation. Although individually he was the largest single stockholder, owning more shares of voting stock than his father and mother combined, the balance of power was held by the seven trusts. In voting the stock held by the trusts, the First National Bank of Birmingham and M. F. Pixton, as trustees, were solidly arrayed on the side of Mr. and Mrs. Ingalls, Sr.

Mr. M. F. Pixton was an employee of The Ingalls Iron Works Company, of which Mr. Ingalls, Sr., was chief executive officer. Mr. Ingalls, Sr., was a member of the Board of Directors of the First National Bank of Birmingham and the corporation was one of its largest depositors. These facts created in the minds of counsel for Mr. Ingalls, Jr., a bona fide belief that as trustees they would be obedient to the demands and direction of Mr. Ingalls, Sr.

At no time did Mrs. Ingalls waiver in her loyalty to her husband and her consequent opposition to her son. Her consistent attitude in this respect is perhaps best pointed up by reference to the proceeding which she filed in the Circuit Court of Jefferson County, Alabama, Equity Division, to have her son declared mentally incompetent to serve as a trustee. It is not to digress to observe that if Messrs. Hare and Greer had not successfully resisted her attempt, the

"7. This agreement takes the place of all other agreements made in the past between Robert I. Ingalls, Jr., and and Francis H. Hare in regard to the payment of attorney fees for any services rendered or to be rendered by Hare or Greer.

"8. This fee agreement includes defending the suit to enforce the option and also any suits that may be brought to remove me as trustee. Any litigation or legal services which are not relevant to issues now pending will be the subject of independent arrangements, which I am free to make at any time.

"Dated at Birmingham, Alabama, this 4 day of August, 1950.

"Robt I Ingalls Jr

Robert I. Ingalls, Jr.

"Francis H. Hare

Francis H. Hare

"Charles W. Greer

Charles W. Greer"

fight between father and son would have ended before it had fairly begun.

A gaze too foreshortened by concentration upon the details of the thirty separate lawsuits [4] which proliferated from the rapidly changing border incidents would miss entirely the main battlelines which were clearly defined and upon which the real contest was waged.

In the heat of battle after February 29, 1949, the father sought to accomplish two objectives, namely, to dominate the trustees in the several trusts to the end that they would vote the stock owned by the trusts as he desired it to be voted, thereby insuring that his son would not be re-elected as a director and returned to his office in the corporation; and to dry up every possible source of income to his son.

On his part, the efforts of the son were concentrated upon a removal of the hostile trustees and their replacement by trustees, who, he hoped, could be persuaded to re-elect him as a director and to restore him to his position in the corporation, and to protect, preserve, increase and obtain his own income and that of his children derived from the trusts.

Illustrative thrusts and counterthrusts during the more than four-year period of litigation serve to illuminate the essential nature and character of legal services rendered to both parties by their attorneys of record.

When compensation in the form of salary and bonus was withheld from Mr. Ingalls, Jr., after his father had fired him, suits were promptly filed in this court in his behalf against Ingalls Iron Works Company and Ingalls Shipbuilding Corporation, taking the position that his discarge had been illegal and ineffective and that he was therefore entitled to continued compensation. Apparently after they had served their purpose as vehicles for the broad discovery permissible under federal rules for use in litigation pending in the state court, each of these actions was, on December 29, 1950, on motion of plaintiff, pursuant to Rule 41(a) (2), Federal Rules of Civil Procedure, 28 U.S.C.A. dismissed without prejudice.

When distributions to the beneficiaries of the several trusts were withheld and not made as to trust income from May 15, 1948, until the middle of 1950, allegedly because of the demands of the father to which the trustees acceded, actions were successfully prosecuted in the state court which resulted in distribution in midsummer of 1950.

When the father refused to deliver to the son a policy of life insurance in the amount of $100,000, in which the father had no interest and to which he asserted no claim, an action in detinue was filed in the state court. The father thereupon delivered over the policy to the son. This action was dismissed at the costs of the defendant.

Several suits were filed by Mr. Ingalls, Jr., as co-trustee or as beneficiary of the several trusts, for the avowed purpose of removing the trustees and for the appointment of other trustees to administer such trusts faithfully and to vote its stock impartially. The one tangible result of these actions was the replacement of the First National Bank, as trustee of Trust "B", by Birmingham Trust National Bank, which, in turn, was subsequently replaced by Hamilton National Bank, Knoxville, Tennessee.

4. The court has carefully reviewed the original court files in each of these cases. They are listed hereunder as to number and style, but no good purpose would be served by describing them further by nature or eventual disposition. In addition to the cases referred to in paragraph 24 of the Stipulation, FN 1, supra, others were: Elesabeth Ridgely Ingalls v. Ingalls Iron Works Co. (C.C. Jefferson Co., Ala., No. 2399–X); Robert I. Ingalls, Jr. v. Ingalls Iron Works Co. (C.C. Jefferson Co., Ala., No. 84808); Ingalls Iron Works v. Fidelity & Deposit Co. (N.D.Ala., No. 6345); Petition of Mrs. Ellen Gregg Ingalls (C.C. Jefferson Co., Ala., No. 82004); Robert I. Ingalls, Jr. v. Ingalls Iron Works Co. (N.D.Ala., No. 6317); Robert I. Ingalls, Jr. v. Ingalls Shipbuilding Corp. (N.D.Ala., No. 6316).

Perhaps the most decisive engagement of this protracted family war was fought in a suit commenced by the corporation on July 5, 1950. The objective of that suit was to enable the corporation to purchase, cancel and retire the 4,501 shares of common capital stock owned by Mr. Ingalls, Jr. in the corporation. On April 15, 1943, father, mother and son had entered into an agreement with the corporation whereunder the corporation was given an option, to be exercised within a stated period of time after the death or retirement of either, to purchase, cancel and retire his stock at a stated price.

It was alleged that Mr. Ingalls, Jr., had retired from the corporation because of his discharge and his subsequent failure of election as director and that the corporation thereby acquired the right to purchase his stock at the option price. The difference between the option price at which the corporation sought to acquire and retire the stock of Mr. Ingalls, Jr., and its fair and reasonable market value as of the date of the filing of such suit was in excess of $2,000,000. Messrs. Hare and Greer successfully defended this action, the Supreme Court of Alabama eventually holding that the word "retirement" as used in the option agreement meant voluntary as distinguished from involuntary retirement. Ingalls Iron Works Co. v. Ingalls, 256 Ala. 124, 53 So.2d 847.

As a predicate to the filing of the above-mentioned option suit, the corporation had tendered to Mr. Ingalls, Jr. the sum of $2,133,000 in cash at the First National Bank in Birmingham, representing that such sum of money was earned surplus of the corporation. Thereafter a suit was filed in behalf of Mr. Ingalls, Jr., against the corporation to require it to distribute such earned surplus in dividends.

For the seven-year period before the filing of this suit, the dividends paid on the outstanding shares of common stock of the corporation equaled five dollars per share. After the filing of such suit and for the year 1950 a dividend of twelve dollars per share was declared by the corporation. The action was thereupon dismissed. In 1951 the dividends were ten dollars per share, in 1952 twenty dollars per share, in 1953 thirty dollars per share, in 1954 to 1956, both inclusive, forty dollars per share.

Mr. Ingalls, Sr., died testate on July 12, 1951. His will was admitted to probate on August 10, 1951, and Mrs. Ellen Gregg Ingalls, Mr. James A. Simpson and The First National Bank qualified as co-executors thereof. That the death of the father had not entirely removed the *casus belli* was made clear by subsequent events. On July 17, 1951, the Board of Directors of The Ingalls Iron Works Company, composed of Mrs. Ingalls and Mr. M. F. Pixton, unanimously adopted a resolution electing not to exercise the corporation's right to purchase the stock held by Mr. Ingalls, Sr., in the company at the time of his death.

On July 24, 1951, Messrs. Hare and Greer filed a stockholder's derivative action in the names of Mr. Ingalls, Jr. and his minor daughter, Elesabeth R. Ingalls, (Barbara Gregg Ingalls, a minor, was added by amendment as a party-complainant on October 1, 1951) against Mr. M. F. Pixton and Mrs. Ingalls, as surviving directors of the corporation, and against the corporation. The primary objective of this suit was to force the corporation to buy the deceased father's stock at the option price. The bill prayed that the July 17, 1951, resolution be declared null and void; that Mrs. Ingalls and M. F. Pixton be enjoined to elect a director of the corporation to succeed Mr. Ingalls, Sr.; that Mrs. Ingalls and Mr. Pixton be enjoined to collect the proceeds of the single premium life insurance policy on the life of Mr. Ingalls, Sr. and to hold said proceeds for the purpose of applying so much thereof as might be necessary for the purchase and retirement of the capital stock owned by Mr. Ingalls, Sr., at the time of his death; that Mrs. Ingalls and Mr. Pixton be enjoined to exercise the option and to retire such stock upon its exercise; that Pixton, Mrs. Ingalls and the corporation be enjoined from using

the proceeds of such life insurance policy for any purpose other than for the purchase of and retirement of the stock of Mr. Ingalls, Sr., and from delivering possession of the certificates evidencing ownership of such stock to the executors of the will of Mr. Ingalls, Sr., and that the corporation be required to pay a reasonable attorney's fee for the services of the attorneys for the complainants in such action.

On August 15, 1951, a temporary injunction was issued in such action, restraining and enjoining Mrs. Ingalls, Mr. Pixton and the corporation from cancelling the option to purchase such stock; from delivering possession of the certificates evidencing ownership of such stock to the executors of the will of Mr. Ingalls, Sr., and from using the proceeds of life insurance for any purpose other than the purchase and retirement of such stock. Such injunction remained in effect until the final dismissal of the action as will hereinafter appear.

On August 7, 1951, W. R. Guest was elected by the directors to the Board to fill the vacancy created by the death of Mr. Ingalls, Sr., and a second resolution electing not to exercise the corporation's right to purchase said stock and releasing all rights that the corporation had under said option contract was passed by a majority of the directors, Mrs. Ingalls refraining from voting.

On September 21, 1951, the by-laws of the corporation were amended to state that the Board of Directors should not be less than three nor more than five, and K. H. Gayle, Jr., was elected to the Board.

On June 30, 1952, the Board of Directors, composed of Mrs. Ingalls, Gayle, Guest and Pixton, unanimously adopted resolutions ratifying the action taken by Mr. Gayle, as president of the company, in making a written agreement with the executors of Mr. Ingall's will extending the time limit in which the company had the right to exercise the option to nineteen months after the death of Mr. Ingalls, Sr., in lieu of the thirteen months provided for in the option contract, and electing not to purchase the stock owned by Mr. Ingalls at the time of his death and releasing all rights that the company might have under such option contract.

On August 5, 1952, the Board, composed of the same members, unanimously adopted a resolution ratifying the action taken by the Board in respect to such option on the three previously mentioned occasions.

At a special meeting of the stockholders of the corporation held on September 19, 1952, there were 14,500 shares out of 15,000 shares represented either in person or by proxy. A motion was made by Pixton and seconded by Mr. Greer, who held the proxy of Mr. Ingalls, Jr., that the by-laws be amended to increase the number of directors to eight and providing that the directors were not required to be stockholders and that they should be elected at the annual meeting of the stockholders and serve until the next annual meeting thereof. The next order of business was the election of the directors and Mr. Zukoski, Vice President and Trust Officer of the First National Bank, issued a statement reciting in substance that an agreement had been reached between all the parties concerned in order to terminate the controversy which had existed. Thereupon he nominated as directors, Mrs. Ingalls, Mr. Pixton, Mr. Gayle, Jr., Mr. Guest, Mr. Ingalls, Jr., Mr. Lanier, Mr. Taylor and Mr. Strickland, and they were unanimously elected as directors of the corporation.

At a special meeting of the Board of Directors on September 22, 1952, the action taken by the stockholders in amending the by-laws was ratified; Mr. Ingalls, Jr., was elected chairman of the Board and Mrs. Ingalls was elected vice president at a salary of $25,000.00 a year. Mr Gayle was re-elected to the office of president of the corporation. Mr. Pixton was made executive vice president and other officers were elected.

On September 23, 1952, at a special meeting of the Board of Directors a resolution was adopted fixing the annual salary of Robert I. Ingalls, Jr., as chairman of the Board, at $50,000.

On December 30, 1952, a special meeting of the reconstituted Board of Directors was held. They adopted a resolution rescinding the resolutions of the old Board and elected to exercise the corporation's option to purchase the stock of Mr. Ingalls, Sr., from the proceeds of the policy of insurance heretofore referred to.

Thereafter, in January, 1953, the proceeds of the life insurance policy in the amount of $1,080,000 were used to purchase the stock of Mr. Ingalls, Sr. Such stock became and was treated as treasury stock of the corporation—a salable asset with a fair market value of $2,750,000.[5]

Following that action, and in March, 1953, the stockholders' derivative action was dismissed on motion of the complainants therein, but the trial court retained jurisdiction thereof for the purpose of determining the allowance of attorneys' fees against the corporation as prayed for in the bill of complaint.

On June 4, 1953, Mr. Ingalls, Jr., personally paid to Messrs. Hare and Greer the aggregate sum of $50,000 for their services in and about the prosecution of the stockholders' derivative action. On the 28th day of August, 1953, the Executive Committee of the corporation voted unanimously to reimburse Mr. Ingalls, Jr., the sum of $50,000 for such attorneys' fees on the theory that the corporation was legally liable therefor. (Mr. Ingalls, Jr., did not claim as a deduction on his income tax return for the year 1953 the $50,000 which he had paid to Messrs. Hare and Greer and for which he had received reimbursement during the same year from the corporation.)

At the annual meeting of the Board of Directors of the corporation held on the second Tuesday in January, 1953, Mr. Ingalls, Jr., was elected chairman of the Board of Directors and made chief executive officer of the corporation at a salary of $80,000 a year. The following year his

salary was increased to $90,000; in the year 1955, his salary plus his earned bonus amounted to $135,000, and in the year 1956, his salary and earned bonus as chairman of the Board and as president was $156,000.

I. Deduction of Attorneys' Fees Paid by Taxpayer to Messrs. Hare and Greer for the Years 1950 to 1953, Both Inclusive.

■ For the reasons hereinafter appearing, the court holds that the Commissioner erred in disallowing claimed deductions for attorneys' fees in years and amounts as follows:

| | |
|---|---|
| 1950 | $125,000.00 |
| 1951 | $ 23,200.00 |
| 1952 | $ 28,725.00 |
| 1953 | $ 99,652.78 |

For convenience, it was recited in paragraph 7 of the Stipulation that during the year 1953 fees aggregating the sum of $100,877.78 were paid by the taxpayer to Messrs. Hare and Greer. An explanatory note points out that of that sum fees aggregating $1,225 were paid to the firm of Pritchard, McCall and Jones of Birmingham, the firm of Fowler, Long and Fowler, of Knoxville, Tennessee, and to Jerome G. Taylor, Attorney at Law, Knoxville, Tennessee, in connection with the preparation of a legal opinion as to the potential liability of the corporation for surtax penalties under Section 102 of the Internal Revenue Act of 1939, 26 U.S.C.A. § 102. Such sum of $100,877.78 did not include the fees aggregating $50,000 paid to Messrs. Hare and Greer for their services in the stockholders' derivative action.

Because the court is of the opinion that the fees aggregating $1,225 for the preparation of the Section 102 opinion, which opinion was obtained in connection with and used in the preparation of the

---

5. In view of the recent opinion of the Supreme Court of Alabama in Ingalls Iron Works Co. v. Ingalls Foundation, 98 So.2d 30, rehearing denied Nov. 21,

1957, this court is not to be understood as indicating its belief that the purported exercise of the option was effective.

stockholders' derivative action, stand on the same footing as the $50,000 paid Hare and Greer in such action, the subject of later discussion, the court concludes that such sum of $1,225 was not a proper deduction and therefore has been subtracted from the amount shown opposite the year 1953 in paragraph 7 of the Stipulation (FN 1, supra).

6. Bingham's Trust v. Commissioner, 325 U.S. 365, 374, 65 S.Ct. 1232, 1237, 89 L. Ed. 1670; Kornhauser v. U. S., 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505; Folker v. Johnson, 2 Cir., 230 F.2d 906; Northern Trust Co. v. Campbell, 7 Cir., 211 F.2d 251; Urquhart v. Commissioner, 3 Cir., 215 F.2d 17; Commissioner of Internal Revenue v. Coke, 5 Cir., 201 F.2d 742; Allen v. Selig, 5 Cir., 200 F. 2d 487; Hill v. Commissioner, 4 Cir., 181 F.2d 906; Hochschild v. Commissioner, 2 Cir., 161 F.2d 817; Rassenfoss v. Commissioner, 7 Cir., 158 F.2d 764; Foss v. Commissioner, 1 Cir., 75 F.2d 326; Agnes Pyne Coke, 17 T.C. 403, affirmed by 5 Cir., 201 F.2d 742; Margery K. Megargel v. Commissioner, 3 T.C. 238.

7. "§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:
"(a) [As amended by Section 121(a), Revenue Act of 1942, supra] Expenses.
"(1) Trade or business expenses.
"(A) In general. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * *

*    *    *    *    *

"(2) Non-trade or non-business expenses. In case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income."

8. Allen v. Selig, 5 Cir., 200 F.2d 487; Beck v. Commissioner, 15 T.C. 642, af-

The court has read and carefully considered the cases cited by plaintiff [6] to sustain their contention that such fees were deductible either under the provisions of Section 23(a) (1) or of Section 23(a) (2) of the Revenue Act of 1939,[7] as well as those relied upon by defendant [8] to support his position that such fees constituted capital expenditures.

firmed 2 Cir., 194 F.2d 537; Bingham's Trust v. Commissioner, 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670; Capitol Indemnity Ins. Co. v. Commissioner, 25 T.C. 147; Chesbro v. Commissioner, 2 Cir., 225 F.2d 674; Estate of Clark v. Commissioner, 2 T.C. 676; Cohan v. Commissioner, 2 Cir., 39 F.2d 540; Commissioner of Internal Revenue v. Flowers, 326 U.S. 465, 66 S.Ct. 250, 90 L.Ed. 203; Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171; Connally Realty Co. v. Commissioner, 31 B.T.A. 349, affirmed 5 Cir., 81 F.2d 221; Croker v. Commissioner, 21 B.T.A. 240, affirmed Croker v. Burnet, 61 App.D.C. 342, 62 F.2d 991; Crowley v. Commissioner, 6 Cir., 89 F.2d 715; Deputy v. DuPont, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416; Eskimo Pie Corp. v. Commissioner, 4 T.C. 669, affirmed 3 Cir., 153 F.2d 301; Flint v. Stone Tracy Co., 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389; Folker v. Johnson, 2 Cir., 230 F.2d 906; Frank v. Commissioner, 20 T.C. 511; Garrett v. Crenshaw, 4 Cir., 196 F.2d 185; Heller v. Commissioner, 2 T.C. 371, affirmed 9 Cir., 147 F.2d 376; Helvering v. Independent Life Ins. Co., 292 U.S. 371, 54 S.Ct. 758, 78 L.Ed. 1311; Helvering v. Winmill, 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52; Higgins v. Commissioner, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783; Holdcroft Transp. Co. v. Commissioner, 8 Cir., 153 F.2d 323; Houston Natural Gas Corp. v. Commissioner, 4 Cir., 90 F.2d 814; Humes v. United States, 276 U.S. 487, 48 S.Ct. 347, 72 L.Ed. 667; Hunter v. United States, D.C., 123 F. Supp. 763, affirmed 2 Cir., 219 F.2d 69; Hutton v. Commissioner, 5 Cir., 39 F. 2d 459; Interstate Transit Lines v. Commissioner, 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607; Kornhauser v. United States, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505; Lindley v. Commissioner, 2 Cir., 63 F.2d 807; Lykes v. United States, 343 U.S. 118, 72 S.Ct. 585, 96 L. Ed. 791; McDonald v. Commissioner, 323 U.S. 57, 65 S.Ct. 96, 89 L.Ed. 68; Missouri-Kansas Pipe Line Co. v. Commissioner, 3 Cir., 148 F.2d 460; Murphy

It is not over-simplicification to rest the decision of this issue on one inescapable conclusion which clearly emerges from the mosaic of complicated facts in this record. But for the legal services rendered by Messrs. Hare and Greer in the areas of conference, advice, strategy, and litigation plaintiff would not have returned to Ingalls Iron Works Company as its chief executive officer at constantly increasing compensation upon which he pays a substantial income tax; his stockholdings therein would have been swept away by the exercise of an option at a grossly inadequate purchase price; his own income and that of his children from the trusts, if not withheld altogether, would have been based upon dividends which were inadequate when measured by the earnings of the corporation.

This court is led unerringly to the conclusion that the attorneys' fees paid for legal services to accomplish the above enumerated objectives were quite reasonable in amount and bore a reasonable and proximate, indeed a direct and immediate, relation to the production of income and to the conservation of property held for the production of income. And this is so even though many of the thirty lawsuits were not litigated to a conclusion and did not, when considered apart from the entire context of the controversy, achieve the objectives at which they were aimed.

This court is of the opinion that a holding of deductibility as to these fees under the precise facts of this case is required by the teaching of Bingham's Trust v. Commissioner, 1945, 325 U.S. 365, 65 S.Ct. 1232, 89 L.Ed. 1670, and

the cases from our circuit of Campbell v. Fields, 5 Cir., 1956, 229 F.2d 197 and Allen v. Selig, 5 Cir., 1952, 200 F.2d 487.

Independent research has produced only one case which this court believes is strikingly analogous on the facts to the case at bar. In Stanley v. Waldheim, 1956, 25 T.C. 839, the Tax Court held that legal fees in connection with a lawsuit in which the taxpayer claimed he had been wrongfully deprived of corporate stock and wrongfully discharged as an employee and officer were deductible partly under section 23(a) (1) and partly under Section 23(a) (2) of the Revenue Act of 1939.

Further extended discussion would unduly prolong this opinion. The court holds that the attorneys' fees described as to dates and amounts in paragraph 7 of the stipulation were properly deductible under the provisions of 26 U.S.C.A. § 23(a) (2) (1939), except as to the amount of $1,225.00, paid in 1953, to which reference was made hereinabove.

II. Inclusion in Taxpayer's Income for 1953 of $50,000 Received by Taxpayer from Ingalls Iron Works as a Reimbursement for Attorneys' Fees Paid Out in the Stockholders' Derivative Action.

█ Restatement of the facts relevant to this issue would be inappropriate as they fully appear hereinabove. Plaintiff[9] contends that the attorneys' fees which he paid in such action, aggregating $50,000, were the primary legal obligation of the corporation; and that the $50,000 for which he was later reimbursed by the corporation did not repre-

Oil Co. v. Burnet, 9 Cir., 55 F.2d 17, affirmed 287 U.S. 299, 53 S.Ct. 161, 77 L. Ed. 318; Newark Milk & Cream Co. v. Commissioner, 3 Cir., 34 F.2d 854; New Colonial Ice Co. v. Helvering, 292 U.S. 435, 54 S.Ct. 788, 78 L.Ed. 1348; O'Connor v. Commissioner, 6 T.C. 323; Schwabacher v. Commissioner, 9 Cir., 132 F. 2d 516; Shipp v. Commissioner, 9 Cir., 217 F.2d 401; Smith v. Commissioner, 40 B.T.A. 1038, affirmed 2 Cir., 113 F.2d 114; South American Gold & Platinum Co. v. Commissioner, 8 T.C. 1297, affirmed 2 Cir., 168 F.2d 71; United States v.

Pfister, 8 Cir., 205 F.2d 538; Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212; Westervelt v. Commissioner, 8 T.C. 1248; Wofford v. Commissioner, 5 T.C. 1152; Knight-Campbell Music Co. v. Commissioner, 10 Cir., 155 F.2d 837.

9. Occasional reference herein to a singular plaintiff to describe Robert I. Ingalls, Jr. is explained by the fact that Jane S. Ingalls is a party plaintiff only because she filed a joint return with her husband for the years involved.

sent income to him but a return of capital. The court has carefully read and considered the cases [10] which he cites to sustain his position.

On the other hand, the defendant insists that the primary legal obligation for the payment of such fees was that of plaintiff and that the $50,000 thereafter paid to him by the corporation represented taxable income to him in the nature of a dividend. The cases [11] cited by him in support of this proposition have likewise been carefully read and considered by the court.

It is the opinion of the court that the touchstone for decision of this issue is the legal incidence of the primary obligation for such fees. This apparently was conceded by the parties at the pretrial conference when the issue with reference thereto raised by Count Four of the complaint and defendant's answer thereto was stipulated in the pretrial order.

The law of Alabama, which, it must be conceded, is controlling on this point as to the liability of a corporation for the fees of complainant's solicitors of record was declared by Justice Coleman for the Supreme Court of Alabama, as follows:

"If the complainants were entitled to the relief granted, the benefit resulted to the corporation, and, through it, to all the stockholders, as such, alike. The complainants could receive no advantage which would not operate equally for the advantage of all the stockholders. If the corporation had filed the bill, there can be no doubt that its solicitors would have been entitled to

reasonable compensation, to be paid by the corporation. Its refusal necessitated the filing of the bill by the stockholders. Under these facts, we have no doubt that the corporation is chargeable with whatever compensation the complainants' solicitors are entitled to." Decatur Mineral & Land Company v. Palm, 113 Ala. 531, 21 So. 315, 316.

Since it was the corporation's obligation to pay such fees and since such fees were reasonable, as the parties agreed and this court finds, it follows that the reimbursement of plaintiff in the amount of $50,000 was a return to him of capital and such sum was erroneously included by the Commissioner in his income for the year 1953.

III. Claimed Deduction of $15,000 Paid by Taxpayer to Attorneys for His Divorced Wife in Connection with a Custody Case.

Since counsel for plaintiff abandoned the issue relating to the deductibility of such fee in brief, and since the well-reasoned opinion in Baer v. Commissioner, 8 Cir., 196 F.2d 646 is diametrically opposed to his contention, this court is content to hold that the Commissioner properly disallowed a deduction therefor.

IV. Inclusion in Taxpayer's Income for the Year 1953 of the Sum of $10,-092.59 as Distributable Income from Trust "A".

An additional statement of facts is necessary to a proper understanding of this issue. In 1953 the Circuit Court of Jefferson County, Alabama, in case No. 78710, Robert I. Ingalls, Jr. as Guar-

10. Bishop v. Commissioner, 1956, 25 T.C. 969; Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688; Riley v. Bradley, 252 Ala. 282, 41 So.2d 641; Van Antwerp Realty Corp. v. Cooke, 230 Ala. 535, 162 So. 97; Mudd v. Lanier, 247 Ala. 363, 24 So.2d 550; Endsley v. Darring, 249 Ala. 381, 31 So.2d 317; Riverside Oil & Refining Co. v. Lynch, 114 Okl. 198, 243 P. 967; Waters v. Disbrow & Co., 8 Cir., 70 F.2d 572; Steinberg v. Hardy, D.C., 93 F.Supp. 873; Goodwin v. Castleton, 19 Wash.2d 748, 144 P.2d 725, 150 A.L.R. 859; Perrine v. Pennroad Corp., 29 Del.Ch. 423, 51 A.2d 327.

11. Cleveland Shopping News Co. v. Routzahn, 6 Cir., 89 F.2d 902; Eskimo Pie Corp. v. Commissioner, 4 T.C. 669, affirmed 3 Cir., 153 F.2d 301; Knight-Campbell Music Co. v. Commissioner, 10 Cir., 155 F.2d 837; Mid-State Products Co. v. Commissioner, 21 T.C. 696; Regensburg v. Commissioner, 2 Cir., 144 F.2d 41, certiorari denied 323 U.S. 783, 65 S.Ct. 272, 89 L.Ed. 625.

dian v. Robert I. Ingalls, Sr., et al, held that all of the seven Ingalls' trusts must pay attorneys' fees in connection with the litigation involving the trusts in the total amount of $156,500. It was adjudicated that Trust "A"'s pro rata share of the balance of such fees was $20,185.18. The beneficiaries under Trust "A" were taxpayer and his mother, each of whom was entitled, under the trust, currently to receive one-half of all income thereof.

These fees were not paid by the trust in 1953. To the contrary, the judgment of the Circuit Court was appealed to the Supreme Court of Alabama,[12] but the judgment of the lower court was not superseded. Under the law of Alabama the appeal without supersedeas suspended no right which the attorneys had to enforce the collection of such fees. Code of Alabama 1940, Title 28, Section 12; Ohio Casualty Insurance Co. v. Gantt, 256 Ala. 262, 54 So.2d 595; Garrett v. Mayfield Woolen Mills, 153 Ala. 602, 44 So. 1026.

Distribution of the sum of $10,092.59 was not made to taxpayer in the year 1953. The trusts set up a reserve out of the trust income for such year in the amount of $20,185.18. Thereafter, Trust "A", although on a cash basis, attempted to take these fees as deductions for the year 1953. When the Commissioner disallowed such deductions, he included in plaintiff's income for the year 1953 the sum of $10,092.59 on the theory that it represented the amount of distributable income by which the trust income was increased as a result of the disallowance of the deduction of these fees.

While the Commissioner was eminently correct in disallowing a deduction of such fees as claimed by the trust, it by no means follows that one-half thereof was properly included in taxpayer's income for the year 1953.

In defining the powers and duties of the trustees thereunder the indenture which created Trust "A" provided in pertinent part as follows:

" * * * and to set up reserves out of income to meet such items of depreciation, obsolescence, amortization or indebtedness as may be deemed by the trustees to be a necessary or proper charge against income."

It is the opinion of the court that the above-quoted language clothed the trustees with a discretion to set aside as a reserve sufficient funds out of the distributable income of the trust to discharge the indebtedness of the trust to the attorneys in the event they sought to enforce their unsuperseded judgment. If that is so, the amount of income held in reserve was taxable to the trust and was not a part of "income which is to be distributed currently" within the contemplation of 26 U.S.C.A. § 162.[13]

To paraphrase the language of Judge Sibley in McCrory v. Commissioner of

---

12. On June 20, 1957, the Supreme Court of Alabama modified and affirmed the decree of the lower court. The modification operated to increase the liability of Trust "A" for attorneys' fees. Ingalls v. Hare, 96 So.2d 266.

13. "§ 162. Net income
"The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, except that—
* * * * *
"(b) [As amended by Section 111(b), Revenue Act of 1942, c. 619, 56 Stat. 798] There shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year which is to be distributed currently by the fiduciary to the legatees, heirs, or beneficiaries, but the amount so allowed as a deduction shall be included in computing the net income of the legatees, heirs, or beneficiaries whether distributed to them or not. As used in this subsection 'income which is to be distributed currently' includes income for the taxable year of the estate or trust which, within the taxable year, becomes payable to the legatee, heir, or beneficiary. Any amount allowed as a deduction under this paragraph shall not be allowed as a deduction under subsection (c) of this section in the same or any succeeding taxable year. * * *" 26 U.S.C.A. § 162.

Internal Revenue, 5 Cir., 1934, 69 F.2d 688, the test here is not what the trustees did, but what their trust empowered or required them to do. What instruction would a court of equity, if appealed to on December 31, 1953, have given them?

It seems clear that a court of equity, if appealed to by the trustees, would have instructed them that they had a discretion to set up a reserve to discharge the indebtedness created by the judgment for attorneys' fees.

Again paraphrasing Judge Sibley's language, the indebtedness for attorneys' fees which are to be paid by the trust, as the indenture makes clear, were burdens or charges upon the trust, subtractions from it rather than a part of its benefits. Payment of them, whenever made, is not distribution to the beneficiaries any more than when an executor pays the debts of the estate in his hands.

That the trust indenture did not make mandatory annual distribution of the gross income of the trust and that the trustees were invested with a discretion to set up reserves was made clear by the Supreme Court of Alabama in Ingalls v. Ingalls, 256 Ala. 321, 54 So.2d 296, 302, wherein provisions in the other six trusts, which were before the court, substantially equivalent to the above-quoted provision of Trust "A" were under consideration. The court there held:

> "The right to set up reserves out of income for [indebtedness] is not inconsistent with the direction to use and apply the income, but on the contrary is designed to further and keep in continued well being the condition of the trust, so as to make expenditures of income reasonably possible. In fact the quoted provision shows that only disbursement of net income to the beneficiaries is contemplated."

This court holds that the Commissioner erred in including in the taxpayer's income for the year 1953 the sum of $10,-092.59 which was not received by him in said year and which was not distributable to him in such year, under the provisions of 26 U.S.C.A., § 162.

Judgment in favor of plaintiffs in conformity with the foregoing opinion will be prepared and presented to the court for entry after recomputation of the amount of refund to which plaintiffs are shown entitled by the attorneys of record for plaintiff and the Director of Internal Revenue for the District of Alabama.